IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

E.F. TRANSIT, INC.,

                Plaintiff,

      v.

INDIANA ALCOHOL AND TOBACCO COM-
MISSION,

              Defendant.

No. 1:13-cv-1927-WTL-MJD

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT**

Barry Simon (*pro hac vice*)
Kannon K. Shanmugam (*pro hac vice*)
Allison B. Jones (*pro hac vice*)
Amy Mason Saharia (*pro hac vice*)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000

David K. Herzog (Atty. No. 1583-49)
A Scott Chinn (Atty. No. 17903-49)
J. Murray Clark (Atty No. 4045-49)
Anne K. Ricchiuto (Atty. No. 25760-49)
FAEGRE BAKER DANIELS LLP
300 North Meridian Street, Suite 2700
Indianapolis, IN 46204
(317) 237-0300

*Counsel for Plaintiff E.F. Transit, Inc.*

**TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................................1

STATEMENT OF MATERIAL FACTS NOT IN DISPUTE.........................................2

    A.    Regulation Of The Wholesale Tier......................................................2

    B.    Regulation Of Warehousing Facilities................................................4

    C.    Regulation Of Alcohol Carriers...........................................................5

    D.    E.F. Transit's Trucking Business..........................................................6

    E.    E.F. Transit's 2009 Agreement with Indiana Wholesale ......................7

    F.    The Commission's Preliminary Assessment And About-Face..............9

    G.    The Commission's Program Of Delay................................................13

    H.    Excise Police Report ..........................................................................15

    I.    Withdrawal Of 2009 Application.......................................................18

    J.    E.F. Transit's 2012 Agreement With Indiana Wholesale ...................19

    K.    The Commission's Interest In Enforcing The Prohibited-Interest Statutes ..........21

ARGUMENT ....................................................................................................................23

I.    THE FAAAA HAS A BROAD SWEEP THAT PREEMPTS STATE LAWS
HAVING A SIGNIFICANT IMPACT RELATED TO PRICES, ROUTES, OR
SERVICES OF A MOTOR CARRIER....................................................................24

    A.    The Commission Has Enforced And Will Continue To Enforce Indiana's
Prohibited-Interest Statutes Against E.F. Transit ..............................25

    B.    The Threatened Enforcement Of Indiana's Prohibited-Interest Statutes Is
"Related To A Price, Route, Or Service" Of A Motor Carrier "With
Respect To The Transportation Of Property"......................................28

    C.    No Exception To FAAAA Preemption Applies Here...........................29

II.    THE TWENTY-FIRST AMENDMENT DOES NOT ALTER THE
PREEMPTION ANALYSIS HERE ........................................................................30

    A.    No Balancing Is Required Because The Commission's Interests In This
Case Are Not Closely Related To The Powers Reserved By The Twenty-
First Amendment ................................................................................31

    B.    Should Balancing Be Required, The Federal Interest In Deregulating The
Trucking Industry Should Prevail Over The State's Nonexistent Interest In
Enforcing The Prohibited-Interest Statutes Against E.F. Transit ........33

CONCLUSION..................................................................................................................35

# TABLE OF CONTENTS

Page

## CASES

*324 Liquor Corp.* v. *Duffy*, 479 U.S. 335 (1987)...................................................30, 31

*Beskind* v. *Easley*, 325 F.3d 506 (4th Cir. 2003) ...........................................33

*California Retail Liquor Dealers Ass'n* v. *Midcal Aluminum, Inc.*,
    445 U.S. 97 (1980)..................................................................31

*Capital Cities Cable, Inc.* v. *Crisp*, 467 U.S. 691 (1984) ...........................30

*Dan's City Used Cars, Inc.* v. *Pelkey*, 133 S. Ct. 1796 (2013).........................24, 25, 29

*Dickerson* v. *Bailey*, 336 F.3d 388 (5th Cir. 2003)........................................33

*Lebamoff Enterprises, Inc.* v. *Huskey*, 666 F.3d 455 (7th Cir. 2012)................................2, 28, 30

*Massachusetts Delivery Ass'n* v. *Coakley*, 769 F.3d 11 (1st Cir. 2014)......................................24

*Mohamad* v. *Palestinian Authority*, 132 S. Ct. 1702 (2012) ..............................26

*Morales* v. *Trans World Airlines, Inc.*, 504 U.S. 374 (1992) .................................24, 25

*North Dakota* v. *United States*, 495 U.S. 423 (1990) ...........................................31, 35

*Northwest, Inc.* v. *Ginsberg*, 134 S. Ct. 1422 (2014) ....................................28

*Rowe* v. *New Hampshire Motor Transportation Ass'n*,
    552 U.S. 364 (2008).................................................................25, 28

*S.C. Johnson & Son, Inc.* v. *Transport Corp. of America, Inc.*,
    697 F.3d 544 (7th Cir. 2012) .....................................................1, 24, 25

*Shaw* v. *Delta Air Lines, Inc.*, 463 U.S. 85 (1983) ....................................28

*Stawski Distributing Co.* v. *Browary Zywiec S.A.*, 349 F.3d 1023 (7th Cir. 2003) ......................30

*Thomas* v. *Nicholson*, 561 F. Supp. 2d 1 (D.D.C. 2008) ...................................26

*Thompson* v. *Gallagher*, 489 F.2d 443 (5th Cir. 1973) .....................................35

*Tobin* v. *Federal Express Corp.*, 775 F.3d 448 (1st Cir. 2014)....................................25

*US Airways, Inc.* v. *O'Donnell*, 627 F.3d 1318 (10th Cir. 2010) ............................................31, 34

Page

Cases—continued:

*Ex parte Young*, 209 U.S. 123 (1908).................................................................28

## CONSTITUTION, STATUTES AND RULE

U.S. Const. Art. I, Sec. 8, cl. 3.........................................................................30

U.S. Const. Amend XXI ............................................................................ *passim*

Airline Deregulation Act of 1978, Pub. L. 95-504, 92 Stat. 1705 ............................1, 25

49 U.S.C. § 13102(23)...........................................................................28, 29

49 U.S.C. § 14501(c) ............................................................................ *passim*

1935 Ind. Acts 1191 ...................................................................................3

Ind. Code § 7.1 ...................................................................................... *passim*

Ind. Code § 7.1-1-1-1 .................................................................................20

Ind. Code § 7.1-1-3-28 ..............................................................................10

Ind. Code § 7.1-2-3-2 ..................................................................................2

Ind. Code § 7.1-3-2-7 ..................................................................................2

Ind. Code § 7.1-3-3-1 ..................................................................................3

Ind. Code § 7.1-3-3-3 ..................................................................................5

Ind. Code § 7.1-3-3-4 ..................................................................................9

Ind. Code § 7.1-3-3-5 ..................................................................................2

Ind. Code § 7.1-3-3-19 ................................................................................3

Ind. Code § 7.1-3-4-1 ................................................................................10

Ind. Code § 7.1-3-4-6 ..................................................................................3

Ind. Code § 7.1-3-7-7 ..................................................................................2

Ind. Code § 7.1-3-8-3 ..................................................................................2

Ind. Code § 7.1-3-10-7 ................................................................................3

Ind. Code § 7.1-3-12-2 ................................................................................2

Page

Constitution, statutes and rule—continued:

Ind. Code § 7.1-3-13-1 ...............................................................................3

Ind. Code § 7.1-3-13-6 ...............................................................................2

Ind. Code § 7.1-3-15-3 ...............................................................................3

Ind. Code § 7.1-3-18-2 ..........................................................................5, 16

Ind. Code § 7.1-3-18-3 ...............................................................................5

Ind. Code § 7.1-3-23-23 .........................................................................4, 27

Ind. Code § 7.1-3-23-30 ........................................................................12, 33

Ind. Code § 7.1-5-9-3 ..........................................................................*passim*

Ind. Code § 7.1-5-9-4 ..........................................................................*passim*

Ind. Code § 7.1-5-9-6 .....................................................................3, 22, 26

Ind. Code § 7.1-5-9-9 ...............................................................................3

Ind. Code § 7.1-5-9-10 ..............................................................................3

Ind. Code § 7.1-5-9-12 ..............................................................................5

Fed. R. Civ. P. 30(b)(6) ..............................................................................4

## MISCELLANEOUS

*New Oxford American Dictionary* 574 (3d ed. 2010) ....................................26

*Webster's Third New International Dictionary* 751 (2002) ...........................26

Plaintiff E.F. Transit, Inc., respectfully submits this Memorandum in Support of its Motion for Summary Judgment.

## INTRODUCTION

In the 1970s, Congress began a decades-long effort to deregulate the domestic airline and trucking industries. Congress sought to ease existing regulations in those industries in order to lower barriers to entry and foster a more competitive marketplace. *See S.C. Johnson & Son, Inc.* v. *Transport Corp. of America, Inc.*, 697 F.3d 544, 548 (7th Cir. 2012). Concerned that state regulation would undermine that federal objective, Congress enacted express preemption provisions, first in the Airline Deregulation Act of 1978 (ADA) and then in the Federal Aviation Administration Authorization Act of 1994 (FAAAA). As relevant here, the FAAAA bars States from "enact[ing] or enforce[ing] a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . with respect to the transportation of property." 49 U.S.C. § 14501(c)(1).

Plaintiff E.F. Transit, Inc., is a federally licensed motor carrier engaged in transporting goods for the alcoholic beverage industry. Its largest customer is Monarch Beverage Company, an Indiana beer wholesaler owned by the same shareholders. E.F. Transit wishes to expand its business and provide transportation services to liquor wholesalers, but defendant Indiana Alcohol and Tobacco Commission ("the Commission")[1] has blocked E.F. Transit from doing so on the ground that any agreement between E.F. Transit and a liquor wholesaler would violate state laws that prohibit beer wholesalers from holding an interest in a liquor wholesaler's permit. Although E.F. Transit is not itself a beer wholesaler, the Commission maintains that any relationship between E.F. Transit and a liquor wholesaler would give E.F. Transit's sister company, Monarch, a

---

[1] Plaintiff has filed a motion to amend the complaint to add the four commissioners as defendants in their official capacities. *See* Dkt. Nos. 111, 112. That motion is pending.

"prohibited interest" in that liquor wholesaler's permit.

E.F. Transit seeks injunctive and declaratory relief under the FAAAA to prevent the Commission from invoking Indiana's prohibited-interest statutes to bar E.F. Transit from providing transportation services to liquor wholesalers. The Commission's interpretation and application of those statutes have interfered with E.F. Transit's "routes" and "services" "with respect to the transportation of property," 49 U.S.C. § 14501(c)(1), and thereby undermined Congress's efforts to open a competitive marketplace for trucking services. Moreover, the Commission cannot stand behind the Twenty-first Amendment to shield itself from the FAAAA's broad preemptive reach. Although that Amendment often requires courts to balance the federal interest in regulating commerce against a State's interest in regulating alcohol, a balancing test is not appropriate in this case because the Commission is not acting pursuant to a "core power" reserved by the Twenty-first Amendment. *Lebamoff Enterprises, Inc.* v. *Huskey*, 666 F.3d 455, 458 (7th Cir. 2012). To the contrary, the Commission has admitted that no state interest related to the sale and distribution of alcohol is served by enforcing the prohibited interest statutes to bar E.F. Transit from providing transportation services to liquor wholesalers.

<p style="text-align:center"><strong>STATEMENT OF MATERIAL FACTS NOT IN DISPUTE</strong></p>

**A.     Regulation Of The Wholesale Tier**

1.      Indiana regulates the production, sale, and distribution of alcoholic beverages through its Alcoholic Beverages Law, found at Title 7.1 of the Indiana Code. The defendant Commission is charged with enforcing this law. *See* Ind. Code § 7.1-2-3-2.

2.      Like many States, Indiana maintains a three-tier system for distributing alcoholic beverages. Under that system, manufacturers sell their products to licensed in-state wholesalers. *See* Ind. Code §§ 7.1-3-2-7, 7.1-3-7-7, 7.1-3-12-2. Wholesalers sell the products to licensed retailers and dealers. *See id.* §§ 7.1-3-3-5, 7.1-3-8-3, 7.1-3-13-6. Retailers and dealers then sell

<p style="text-align:center">2</p>

the products directly to consumers.  *See id.* §§ 7.1-3-4-6, 7.1-3-10-7, 7.1-3-15-3.  Except in cer-

tain limited circumstances, no business may operate in more than one tier.  *See id.* §§ 7.1-5-9-9,

7.1-5-9-10(a); Stewart Tr. 63:14-64:20 (Ex. 2).

     3.     The Commission does not issue general permits to sell all types of alcohol.  In-

stead, companies operating within a particular tier of the three-tier system must obtain a specific

permit to sell beer, wine, or liquor.  Thus, at the wholesale level, the Commission issues three

types of permits: a beer wholesaler's permit, *see* Ind. Code § 7.1-3-3-1; a wine wholesaler's

permit, *see id.* § 7.1-3-13-1; and a liquor wholesaler's permit, *see id.* § 7.1-3-3-1.

     4.     Indiana law prohibits a beer wholesaler from holding an interest in a liquor per-

mit, and vice versa.  *See* Ind. Code §§ 7.1-5-9-3, 7.1-5-9-4(2), 7.1-5-9-6.  No parallel restriction

binds wine wholesalers, which may hold an interest in either a liquor or a beer wholesaler's per-

mit, but not both.  *See id.* § 7.1-3-13-1, 7.1-3-3-19.

     5.     The restriction on beer and liquor wholesalers dates to the immediate aftermath of

Prohibition.  *See* H. 399, 79th Reg. Sess., 1935 Ind. Acts 1191, § 41(o), (p).  At the time of en-

actment, the restriction furthered a patronage system in which state lawmakers controlled the is-

suance of liquor licenses and county lawmakers controlled beer licenses.  *See* Ex. 11, at 41.

     6.     At a 2008 Commission hearing, the owner of National Wine and Spirits, a major

liquor wholesaler, testified that "no rational business reason" justifies the restriction in the mod-

ern era.  Ex. 11, at 41.  David Heath, then chairman of the Commission, agreed that "that's a

very true statement."  *Id.*

     7.     In this case, one of the Commission's designated Rule 30(b)(6) witnesses[2] could

---

[2]  The Commission designated Officer Scott Bedwell and Officer Brian J. Stewart, both of the Indiana Excise Police, to give deposition testimony on its behalf pursuant to Federal Rule of

not identify *any* purpose for the prohibition on a beer wholesaler having an interest in a liquor wholesaler's permit, observing that it is enforced only because "that's the law."  Stewart Tr. 69:6-25.  And the witness conceded that, if the prohibition were repealed, it would not adversely affect the Commission's ability to enforce any other alcohol regulations.  *See id.* at 70:16-71:3.

8.      The Commission's other designated witness testified that the prohibition on a beer wholesaler having an interest in a liquor wholesaler's permit serves the State's purported interest in ensuring that an individual wholesaler does not acquire "too much control over a product that was being used by the citizens of the State of Indiana."  Bedwell Tr. 101:23-102:23 (Ex. 1).  But he conceded that there is no evidence that the prohibition serves that purpose.  *See id.* at 102:24-103:14.[3]

9.      Although the justification for the prohibition is nonexistent, the penalties for violating it are severe.  *See* Poindexter Tr. 74:11-75:9 (Ex. 3).  Sanctions include mandatory revocation of the wholesaler's permit and the imposition of criminal penalties.  *See* Ind. Code §§ 7.1-3-23-23, 7.1-5-9-3, 7.1-5-9-4; Bedwell Tr. 227:8-22.  If the wholesaler has a parent company that distributes alcohol in other States, denial or revocation of a permit in Indiana could jeopardize the parent company's permits in those States.  *See* Bedwell Tr. 225:5-226:11; Coxey Tr. 81:18-82:16 (Ex. 4).

B.      **Regulation Of Warehousing Facilities**

10.      The Commission also regulates the warehousing facilities used by wholesalers.

---

Civil Procedure 30(b)(6).  The statements of Officers Bedwell and Stewart thus represent statements and admissions of the agency itself.

[3]  To be clear, plaintiff E.F. Transit is not challenging the validity of the prohibited interest statutes generally—though it believes that these statutes lack any conceivable justification.  As will be shown, it is challenging the Commission's contorted *application* of these statutes to bar E.F. Transit from providing transportation services (including warehousing services) to a liquor wholesaler at commercially reasonable rates.

The Alcoholic Beverages Law prohibits beer and liquor wholesalers from maintaining any warehouse other than the one described in their permit. *See* Ind. Code § 7.1-5-9-12; Stewart Tr. 73:25-74:9. Thus, if a liquor or beer wholesaler wishes to change the location of its warehouse, it must file an application with the Commission.

11. An additional restriction exists only for beer wholesalers. The Indiana Code forbids beer wholesalers from leasing warehouse space owned by manufacturers or retailers. *See* Ind. Code § 7.1-3-3-3. But it does not forbid beer or other wholesalers from leasing warehouse space from other wholesalers. *See* Bedwell Tr. 122:13-123:19. In fact, the Commission at one time granted approval for Olinger Distributing Company, a major liquor wholesaler, to lease warehouse space temporarily from Southeastern Beverage Company, a beer wholesaler. *See* Terry Tr. 137:21-138:16 (Ex. 10).

12. In addition, the Indiana Code does not forbid beer, liquor, and wine wholesalers from using space within the same warehouse as other wholesalers, as long as they have different addresses—even if that means only different suites or rooms within the building—and maintain physical separation of their products. *See* Bedwell Tr. 119:20-120:16; Stewart Tr. 77:18-78:17.

### C.     Regulation Of Alcohol Carriers

13. The Alcoholic Beverages Law regulates motor carriers engaged in the transportation and delivery of alcoholic beverages. Any motor carrier that wishes to "haul, convey, transport, or import alcoholic beverages" on state highways must obtain a carrier's permit from the Commission. *See* Ind. Code § 7.1-3-18-3.

14. A carrier's permit enables a motor carrier to transport all three types of alcoholic beverages. *See* Ind. Code § 7.1-3-18-2; Bedwell Tr. 127:11-14, 128:15-25. Thus, motor carriers, unlike wholesalers, need not obtain separate permits to transport beer, wine, and liquor. *See* Stewart Tr. 86:9-87:9; Coxey Tr. 31:13-21.

5

15.     Motor carriers may transport products for more than one manufacturer or whole-saler, *see* Poindexter Tr. 25:18-24, and the Commission does not require them to disclose whether they are transporting product for beer, wine, or liquor companies or some combination of the three, *see id.* at 25:25-26:3.  It is fully consistent with state law for motor carriers to transport product for beer, liquor, and wine companies on the same truck.  *See id.* at 23:3-23.  Indeed, the Commission has admitted that E.F. Transit is authorized to transport all three types of alcohol. *See* Def.'s Answer, ¶ 9, Dkt. No. 18.

**D.     E.F. Transit's Trucking Business**

16.     Plaintiff E.F. Transit is a trucking company that has been in business since 1996. Terry Tr. 11:20-21.  It holds a motor carrier's license issued by the United States Department of Transportation, as well as a motor carrier's certificate issued by the State of Indiana.  *See* Exs. 12, 13; Terry Tr. 27:14-18.  It is also licensed by the Commission to transport beer, wine, and liquor.  *See* Ex. 14; Terry Tr. 25:19-24.

17.     E.F. Transit employs approximately 380 people and provides transportation services to various companies in the alcoholic beverage industry, including MillerCoors, a brewer, and Ball Manufacturing, a company that manufactures beer cans.  Terry Tr. 12:4-14, 14:22-15:12, 24:19-20.

18.     Its largest customer is Monarch Beverage Company, a beer and wine wholesaler owned by the same shareholders as E.F. Transit.  *See* Terry Tr.35:19-24.  Like E.F. Transit, Monarch is a longtime corporate citizen of Indiana.  It has done business in the State since 1947 and currently employs more than 300 people.  Terry Tr. 11:8-10, 37:10-11.

19.     Although they do business together, E.F. Transit and Monarch are separate corporate entities and are recognized as such by the State.  Although they have common owners, they maintain separate bank accounts, payrolls, and records, and they file separate federal and state

tax returns.  *See* Ex. 15 (Terry Affidavit); Terry Tr. 77:25-78:25.  Monarch compensates E.F. Transit for the transportation services it provides.  Ex. 19, at 6-7.

20.     The Indiana Department of Revenue provides an exemption from sales tax to motor carriers on the condition that they demonstrate their independence from related companies, including parent companies, for which they provide delivery services.  *See* Ex. 16.  E.F. Transit and Monarch have satisfied the department's criteria for corporate separateness since E.F. Transit's formation in 1996.  *See* Bedwell Tr. 168:8-169:15.

### E.     E.F. Transit's 2009 Agreement with Indiana Wholesale

21.     E.F. Transit operates a 500,000-square-foot warehouse located at 9347 Pendleton Pike in Indianapolis.  It has invested millions of dollars equipping the warehouse with a state-of-the-art conveyor system for sorting and loading pallets of alcoholic beverages onto trucks for delivery around Indiana.  Terry Decl. ¶¶ 3, 4 (Ex. 55).  E.F. Transit subleases space in the warehouse to Monarch Beverage, for which it also provides delivery services.  Terry Tr. 23:10-12.

22.     In 2009, E.F. Transit reached a tentative agreement to lease additional space in the warehouse to Indiana Wholesale Wine & Liquor Company ("Indiana Wholesale"), an Indiana liquor and wine wholesaler.  *See* Ex. 17.  As it does with Monarch, E.F. Transit agreed to provide transportation services to Indiana Wholesale.  *See* Ex. 18; Terry Tr. 55:9-56:24.

23.     Indiana Wholesale is a subsidiary of Johnson Brothers Liquor Company that has done business in Indiana since the 1980s.  Ex. 15 (Submission, p. 2); Ex. 19, at 3.  It shares no common ownership with E.F. Transit or Monarch.  Stewart Tr. 112:10-14.  Indiana Wholesale exercises no control over these companies, nor vice versa, and it has never had a financial relationship with them other than provided in the contract for transportation services.  *Id.* 112:10-20.

24.     Under the agreement, all functions that must be performed by a wholesaler remained with Indiana Wholesale.  *See* Bedwell Tr. 213:20-23, 215:3-10; Stewart Tr. 314:25-

318:11; Poindexter Tr. 65:2-8. Indiana Wholesale would purchase its products from manufacturers or suppliers and sell its products to retailers and dealers; set prices for those products; and manage inventory and quality control once the products had been delivered to retailers and dealers. *See id.*; Ex. 20 (flow charts). Meanwhile, E.F. Transit would perform the functions of a carrier, including storing product before delivery, loading product onto trucks, and collecting payments and signed receipts from retailers and dealers on behalf of Indiana Wholesale, for a flat, commercially reasonable fee. *See* Bedwell Tr. 180:7-185:25; Stewart Tr. 312:16-314:24.

25. Monarch was neither a party to nor a third-party beneficiary of the contract between E.F. Transit and Indiana Wholesale. *See* Ex. 18.

26. If the agreement had been approved by the Commission, it would have allowed Indiana Wholesale to achieve significant efficiencies. Indiana Wholesale would have acquired more space than it had in its existing warehouse, and it would have been able to take advantage of E.F. Transit's superior sorting and loading equipment and its large delivery fleet. *See* Ex. 15 (Submission, pp. 2-3); Terry Tr. 39:23-40:15. The agreement also would have permitted E.F. Transit to expand its customer base. *See* Terry Tr. 40:1-15.

27. In E.F. Transit's view, the agreement fully complied with state law. Terry Tr. 47:8-51:9. E.F. Transit's carrier's permit allowed it to transport products for multiple wholesalers and to place beer, wine, and liquor on the same truck. *See* Coxey Tr. 34:19-24. In addition, no provision of the Indiana Code prohibits beer and liquor wholesalers from leasing space within the same warehouse. *See* Bedwell Tr. 121:23-122:1; Stewart Tr. 35:2-20, 74:1-78:3. Coxey, the Commission's staff attorney at the time, and Major Robin Poindexter, the highest-ranking, non-political appointee in the Excise Police at the time, agreed with that assessment. Coxey Tr. 61:11-76:4; Poindexter Tr. 34:14-38:19.

28.     The Commission had no history of interpreting E.F. Transit's contractual relation-ships as endowing Monarch with a prohibited interest.  For example, E.F. Transit has long trans-ported products for MillerCoors, a beer manufacturer.  *See* Terry Tr. 12:4-14.  Yet the Commis-sion has never viewed this relationship as giving Monarch a prohibited interest in a beer manu-facturer's permit.  *See* Stewart Tr. 90:6-91:13; 165:12-17.

29.     Furthermore, E.F. Transit previously provided warehousing and delivery services to Bon Vivant Libations, Inc., a beer wholesaler.  Ex. 21 (Supplemental Terry Affidavit).  The Commission approved that arrangement, apparently concluding that E.F. Transit's contract with Bon Vivant did not give Monarch a prohibited interest in another beer wholesaler's permit.  *See* Stewart Tr. 79:4-10; Ind. Code § 7.1-3-3-4.

**F.     The Commission's Preliminary Assessment And About-Face**

30.     Before Indiana Wholesale filed an application to transfer its warehouse to the Pendleton Pike location, E.F. Transit and Indiana Wholesale asked the Commission to review the proposed agreement and let them know whether it would receive the Commission's approval. Ex. 22.  At a meeting in May 2009, representatives of the two companies provided a copy of the services agreement to the Commission and explained why it complied with all relevant laws, in-cluding the prohibited-interest provisions.  *See* Terry Tr. 41:1-43:16; Ex. 23; Ex. 24.

31.     The Commission's staff attorney, Melissa Coxey, evaluated the proposed agree-ment and concluded that permitting E.F. Transit to sublease warehouse space and transport prod-uct for Indiana Wholesale was consistent with state law.  As is relevant here, she concluded that the agreement would not give Monarch a prohibited interest in Indiana Wholesale's liquor per-mit.  *See* Ex. 24.

32.     "In this case," Coxey wrote in a May 22, 2009, e-mail to the Commission chair-man and staff, "the two wholesalers are operated independently and merely utilize the same

transportation company." *See* Ex. 24.  She added that, "[s]ince the Commission allows the use of common carriers by multiple wholesalers, in this limited circumstance, I do not believe it rises to the level of a prohibited interest." *Id.*

33.    Coxey also observed that the Commission regularly permitted the formation of separate companies, such as Monarch and E.F. Transit, to permit business transactions that might be prohibited if conducted by a single entity.  *See* Ex. 24; Coxey Tr. 56:19-57:6; Poindexter Tr. 28:12-29:12.  By way of example, she noted that separate companies had been formed to hold retail permits and package liquor store permits, which cannot be held by a single corporation.  Ex. 24; *see also* Ind. Code § 7.1-3-4-1 (retailers sell for on-premises consumption); Ind. Code § 7.1-1-3-28 (package stores sell for off-premises consumption).

34.    Thomas Snow, then-chairman of the Commission, agreed with Coxey that the Commission had "allow[ed] permittees to create separate corporate entities to achieve these types of results," and he advised the other commissioners that he was "not suggesting we change this policy." *See* Ex. 22.

35.    Unlike other permittees that were permitted to create separate entities, E.F. Transit was not formed for the express purpose of entering into the services agreement with Indiana Wholesale.  As of 2009, E.F. Transit had been in business for more than a decade and was providing transportation services to companies other than Monarch.  Poindexter Tr. 40:11-18.

36.    The Commission initially determined that there was "no legal impediment" to the arrangement and notified E.F. Transit and Indiana Wholesale of that conclusion.  Ex. 25; Terry Tr. 41:1-43:16.  The Commission also gave Indiana Wholesale the "go ahead" to file its application to transfer its warehouse to Pendleton Pike.  *See* Ex. 26; Poindexter Tr. 31:15-32:3; Terry Tr. 43:5-16.

10

37.     In July 2009, however, Jim Purucker, executive director of Wine and Spirits Distributors of Indiana ("Wine and Spirits"), approached Chairman Snow to express opposition to the arrangement.  Ex. 25.  Wine and Spirits is an interest group that represents competitors of Monarch and Indiana Wholesale; it had previously attempted to prevent Indiana Wholesale altogether from obtaining a permit to do business in the State.  *See* Stewart Tr. 208:21-209:23; Dunsmore Tr. 22:11-16 (Ex. 7).  After the two met, Snow requested that Purucker prepare a memo setting out potential legal arguments against the transaction.  *See* Ex. 27.

38.     Even though Monarch was neither a party to nor a third-party beneficiary of the contract between E.F. Transit and Indiana Wholesale, Purucker's memo disparaged the agreement as an "attempt" by Monarch to "get in the business of selling and/or distributing spirits." *See* Ex. 27.  As the Commission's designated witnesses conceded, however, under the 2009 agreement neither Monarch nor E.F. Transit would perform any functions that must be performed by a liquor wholesaler.  *See* Bedwell Tr. 213:20-23; Stewart Tr. 314:25-318:11.

39.     Although Coxey had already provided a legal opinion on the transaction, Snow did not forward her a copy of Purucker's memo.  *See* Coxey Tr. 50:15-53:7.

40.     Instead, Snow delivered the memo to Jessica Norris, a policy director for then-Governor Mitch Daniels.  *See* Ex. 28; Stewart Tr. 297:5-22.  Norris's supervisor was Betsy Burdick, the deputy chief of staff to Governor Daniels.  Burdick was then dating, and is now married to, Joe Bill Wiley, who has contacted the governor's office on matters of interest to Wine and Spirits.  *See* Norris Tr. 195:19-196:7; Ex. 29.  And Betsy Burdick's brother is Brian Burdick, a lawyer who has represented Wine and Spirits.  Norris Tr. 42:14-25; Ex. 11, at 25.

41.     Norris was new to her role as policy director, and she testified that she had only limited knowledge of the parties involved in the transaction and the laws governing their con-

duct.  Norris had no idea what services motor carriers are allowed to perform under Title 7.1. *See* Norris Tr. 30:23-31:3 9 (Ex. 5).  Nor did she understand the difference between E.F. Transit (a motor carrier) and Monarch (a beer wholesaler).  Norris Tr. 32:3-20.  Nonetheless, she told Snow, "I  .  .  .  don't like [the] proposal" between Indiana Wholesale and E.F. Transit.  Ex. 30.

42.     Norris testified that it would have been improper for her, or any other member of the governor's staff, to influence the outcome of particular applications that were pending before the Commission.  *See* Norris Tr. 52:14-17, 52:25-53:3.  As Norris was aware, Indiana law prohibits the Commission from denying applications "on arbitrary, capricious, or political grounds." Ind. Code § 7.1-3-23-30; *see* Norris Tr. 26:23-27:5; Poindexter Tr. 46:12-19.

43.     After Norris received the Wine and Spirits memo, however, the Governor's Office unequivocally informed the Commission that it opposed the agreement between Indiana Wholesale and E.F. Transit.  *See* Bedwell Tr. 249:25-252:23; Coxey Tr. 53:23-54:12; Ex. 31.  In an e-mail message to the other commissioners, Snow advised as follows:

> The Monarch big ass building[4] issue is heating up.  .  .  .   this is the one we gave Monarch a green light on (on a preliminary basis).  then the gov's office got involved after receiving a legal memo authored by Purucker's legal counsel.  .  .  .  gov's office is flat out against this happening (as I previously informed you).

Ex. 31.

44.     Snow solicitously assured Norris that "we know with certainty where you folks stand and will honor your position."  Ex. 26.  He noted that the Commission could not prevent Indiana Wholesale from filing an application to transfer its warehouse, but he suggested that the governor's office might want to give Indiana Wholesale "negative vibes" in order to dissuade the company from proceeding.  *Id.*

---

[4] In internal e-mails, Commission members and staff repeatedly referred to E.F. Transit's 500,000-square-foot warehouse as "the Monarch big ass building."  *See, e.g.*, Exs. 24, 46.

45.     E.F. Transit had no knowledge of these communications until it obtained them in discovery in this litigation.  In fact, Norris and Earl Goode, the governor's chief of staff, expressly assured Phil Terry, E.F. Transit's chief executive, that there was no political objection to the transaction.  Terry Tr. 43:5-47:6, 98:1-99:1.

**G.     The Commission's Program Of Delay**

46.     On September 22, 2009, Indiana Wholesale filed a formal application to move its warehouse to the E.F. Transit facility on Pendleton Pike.  *See* Ex. 32.

47.     Numerous Commission witnesses acknowledged that one way to kill a time-sensitive commercial proposal is to delay action, Stewart Tr. 283:6-20; Snow Tr. 67:15-70:1 (Ex. 8); Dunsmore Tr. 27:16-28:8, and the Commission appears to have pursued that strategy.

48.     In October 2009, an Excise Police officer conducted an inspection of the area that Indiana Wholesale would occupy within the Pendleton Pike warehouse and found no problems. Ex. 33.  Although the Commission knew that a more thorough excise investigation would be necessary because Wine and Spirits had alleged that the transaction created a prohibited interest, *see* Huskey Tr. 108:19-110:21 (Ex. 6), the Commission did not order one at that time.

49.     At the Commission's December 1, 2009, meeting, when Indiana Wholesale's application first appeared on the agenda, Chairman Snow stated that he "was intending to order an investigation at least after today's proceedings."  Ex. 34 (Transcript, p. 1).  But Snow did not follow through on that pledge for several months.

50.     Also in December 2009, Purucker wrote to Ed Dunsmore, the Commission's executive secretary, inquiring about "the schedule you have developed for the Indiana Wholesale/Monarch transfer application."  A schedule had not yet been devised.  *See* Ex. 35.

51.     In January 2010, the Commission received another inquiry about the status of the Indiana Wholesale application.  Dunsmore replied:  "It is not out of the investigation stage yet

13

and no dates for hearing have been set."  Ex. 36.  In fact, the investigation stage had not even be-gun.  The Commission waited until March 2010—nearly six months after the application was filed—to request the excise investigation that Snow had promised to order in December.  *See* Ex. 37, at 1; Swallow Tr. 52:3-53:11 (Ex. 9).

52.     It was not until early March that the Commission set a date—April 20, almost seven months after Indiana Wholesale had filed its application—for another hearing on the ap-plication.  *See* Ex. 38.  And Snow told the governor's office that the Commission did not intend to vote at that meeting, but would instead continue to hold the application.  *See* Ex. 39.

53.     None of the Commission witnesses could explain these delays.  *See* Stewart Tr. 277:18-23; Huskey Tr. 111:23-113:21; Snow Tr. 94:9-96:16; Dunsmore Tr. 44:2-46:13.

54.     Indeed, it was inevitable that the Commission would postpone any action on April 20, because it did not release a key document—the Excise Police report on the proposed ar-rangement—until the day before the hearing.  *See* Ex. 40.  That was true even though the report had been completed five days earlier.  *See* Ex. 37, at 3.

55.     The report, by Officer Richard Swallow, was "very critical" of the agreement be-tween E.F. Transit and Indiana Wholesale.  Coxey Tr. 80:1-81:7.  The report concluded that the agreement not only would give Monarch a prohibited interest in a liquor wholesaler's permit, but also would violate several other provisions of the Alcoholic Beverages Law.  *See* Ex. 37, at 6.

56.     At the April 20 hearing, Peter Rusthoven, attorney for Indiana Wholesale, told the Commission that the report came "out of the blue to us" and that portions of it were "completely contrary to our understanding of what the business deal is."  Ex. 41 (Transcript, p. 7).  Rusthoven asked for additional time to respond to the report, *see id.* at 7-8, and the Commission granted his request, *see id.* at 13-15.

14

57.     During the period that the Commission delayed action on the application, Indiana Wholesale's lease expired at its existing warehouse.  With no deal approved for it to move to Pendleton Pike, Indiana Wholesale was forced to renew its lease.  Exs. 41 (Transcript, p. 6), 45.

**H.     Excise Police Report**

The report prepared by Officer Swallow was riddled with factual and legal errors.  *See* Ex. 37.  Those errors resulted from Officer Swallow's lack of familiarity with the prohibited-interest statutes; his failure to seek guidance from the Commission's staff  attorney; his limited research; and his neglect of instructions given by his supervisor.

58.     Officer Swallow had no previous experience investigating potential violations of the prohibited-interest statutes, and he did not seek any guidance as to the scope of those provisions from Coxey, the Commission's staff attorney.  *See* Swallow Tr. 29:4-9.  In fact, the only piece of guidance Officer Swallow received was the legal memo written by Wine and Spirits and given to him by then-Excise Superintendent Alex Huskey, a political appointee who had been told the governor's office was "flat out against" the proposal.  *See* Swallow Tr. 38:20-41:10; Ex. 31.  Officer Swallow neither requested nor received any legal analysis from Indiana Wholesale or E.F. Transit.  *See id.* at 41:11-22.

59.     Officer Swallow never even interviewed anyone from Indiana Wholesale, although it is standard practice for excise officers to interview representatives of the company that has an application pending before the Commission.  *See* Swallow Tr. 19:3-5; Stewart Tr. 276:18-277:17.  Officer Swallow testified that he did not believe such an interview would be "relevant" to his investigation.  *See* Swallow Tr. 19:6-9.

60.     Officer Swallow also disregarded the instructions of Major Poindexter, the commanding officer who assigned him to the investigation.  Major Poindexter directed Officer Swallow to include only facts in his report, not legal conclusions as to whether Indiana Wholesale's

move to E.F. Transit's warehouse would violate any provisions of the Alcoholic Beverages Code. *See* Poindexter Tr. 47:18-48:24. To the surprise of Major Poindexter, however, Officer Swallow's report was filled with such conclusions. *See id.*

61.    For example, Officer Swallow stated that several of the tasks E.F. Transit had agreed to undertake as part of the agreement would exceed the scope of its alcohol carrier's permit, in violation of Indiana Code § 7.1-3-18-2. Those supposedly prohibited tasks included (1) maintaining records of its shipments and (2) representing that E.F. Transit is familiar with the nature of the product it is carrying and is complying with applicable laws. *See* Ex. 37, at 6.

62.    But Officer Swallow never asked his supervisors or Coxey, the Commission's staff attorney, whether they agreed with his interpretation of state law. As it turned out, both Major Poindexter and Coxey believed that all of E.F. Transit's duties under the agreement were perfectly consistent with Indiana law. *See* Poindexter Tr. 34:14-38:19; Coxey Tr. 63:4-75:17. And both of the Commission's designated representatives also testified that the duties assigned to E.F. Transit were all "normal and appropriate for a carrier" and within the scope of its permit. *See* Bedwell Tr. 180:7-195:18; Stewart Tr. 303:16-312:15. In the Commission's view, the *only* problem with the agreement is that it gave Monarch a prohibited interest in a liquor wholesaler's permit, not that it required E.F. Transit to exceed the scope of its carrier's permit. *See* Bedwell Tr. 195:19-196:11.

63.    Finally, Officer Swallow's report contained demonstrable falsities and inexplicable inaccuracies. For example, in the context of asserting that E.F. Transit and Monarch are really one entity, Officer Swallow noted that "the only reason" E.F. Transit's name appears alongside the Monarch logo on the delivery trucks "is due to the Department of Transportation requiring it." Ex. 37, at 5. The supposed source of this information was Fred Dufour, E.F. Transit's

senior vice president of operations, who gave Officer Swallow a tour of the Pendleton Pike warehouse and explained how several features of Indiana Wholesale agreement would work.

64.     But an audio recording of Officer Swallow's visit to the warehouse discloses that Dufour clearly stated that the vehicles could be marked however the Commission wished, including without any Monarch logo.  *See* Ex. 42; Audio Recording Tr. 23:21-24:19 (Ex. 43).  Officer Swallow's supervisors had instructed him to record the visit because his poor behavior toward regulated parties had previously been the subject of an "abnormal number of complaints."  Poindexter Tr. 49:9-50:15; *see also* Huskey Tr. 132:4-135:9.  But Officer Swallow never reviewed the recording to make sure he correctly captured Dufour's statements, nor did he take any notes during his visit.  *See* Swallow Tr. 61:17-62:18.  Instead, he swore that he prepared the factual portion of his report on the same day he visited the Pendleton Pike warehouse; that he clearly recalled what had happened; and that Dufour made no such comment.  *See* Swallow Tr. 62:10-63:8; 102:20-105:22.

65.     Furthermore, Officer Swallow's report incorrectly stated that Monarch would "take all orders" on behalf of Indiana Wholesale.  *See* Ex. 37, at 4.  Officer Swallow testified that he recalled "to a certainty" that Dufour gave him this information.  *See* Swallow Tr. 80:15-81:10.  But, once again, the audio recording reveals Dufour clearly told Officer Swallow that Monarch and Indiana would not share a sales force and that Indiana Wholesale's own salespeople would take the company's orders.  *See* Ex. 42; Audio Recording Tr. 13:11-16:25.

66.     Despite these abundant errors, Superintendent Huskey praised Officer Swallow at the Commission's April 20 hearing for "d[oing] an excellent job putting this document together in doing the investigation."  Ex. 41 (Transcript, p. 4).

67.     After the report was issued, Phil Terry, E.F. Transit's chief executive, met several

17

times with Officer Swallow in an effort to correct the errors in the report.  *See* Ex. 44.  Several months later, Officer Swallow issued a supplemental report that incorporated some of this information but adhered to the original conclusions.  *See* Ex. 37, at 9-10.

68.   Major Poindexter, one of Officer Swallow's supervisors, testified that E.F. Transit's efforts were futile.  Because the governor's office opposed E.F. Transit's agreement with Indiana Wholesale, he said, nothing would persuade the Commission to approve the application. *See* Poindexter Tr. 76:22-77:8.

### I.   Withdrawal Of 2009 Application

69.   After Office Swallow issued his supplemental report, Snow informed counsel for Indiana Wholesale that the Commission planned to deny the application.  *See* Terry Tr. 96:2-21.

70.   Before the Commission could vote, Indiana Wholesale withdrew its application in order to avoid the adverse consequences of a denial.  *See* Ex. 45; Poindexter Tr. 75:1-14.  When Snow received Indiana Wholesale's withdrawal letter, he wrote to Norris expressing his satisfaction at this "good news."  *See* Ex. 46.

71.   Even after Indiana Wholesale withdrew its application, Indiana Wholesale and E.F. Transit were eager to revive the deal.  *See* Poindexter Tr. 77:18-79:18.  Although they believed the original agreement conformed with state law, E.F. Transit approached the Commission and offered to make changes to the layout of its warehouse and its plan for storing and handling Indiana Wholesale's products to address points raised in Officer Swallow's report.  *See* Ex. 47.

72.   Coxey and Major Poindexter both testified that E.F. Transit's proposal would address the concerns identified by Officer Swallow.  *See* Poindexter Tr. 77:18-79:13.  But the Commission never responded to E.F. Transit's proposals.  *See* Coxey Tr. 88:13-89:19; Snow Tr. 120:14-122:25; Terry Tr. 109:14-25.

J.      **E.F. Transit's 2012 Agreement With Indiana Wholesale**

73.     In 2012, E.F. Transit and Indiana Wholesale proposed a narrower agreement under which E.F. Transit would transport and deliver products for, but not lease warehouse space to, Indiana Wholesale in exchange for a flat, per-case fee.  *See* Ex. 48.

74.     Under the new agreement, Indiana Wholesale would store products at its own warehouse in Indianapolis and sort and package those products for pickup by E.F. Transit, which in turn would deliver them to retailers and dealers.  Along the way, E.F. Transit would return to Pendleton Pike and combine Monarch and Indiana Wholesale products so they could be loaded for delivery in the most efficient way possible.  *See* Ex. 19, at 10.  That proposal would enable E.F. Transit to operate the most efficient routes, consolidating onto the same truck products from different wholesalers slated for delivery to the same retailers and dealers.  Terry Decl. ¶ 7.

75.     Because the Commission does not ordinarily regulate transportation agreements between wholesalers and motor carriers, Indiana Wholesale and E.F. Transit did not need to seek the Commission's approval.[5]  They nonetheless sought the Commission's blessing to ensure they were staying within the bounds of the law.  *See* Coxey Tr. 112:19-113:1.

76.     Excise Officer Brian J. Stewart conducted a detailed investigation to assist Coxey, the staff attorney, in advising the Commission whether the arrangement should be permitted.  Coxey was particularly interested in details of the relationship between Monarch and E.F. Transit.  Stewart Tr. 125:9-128:11.  After Officer Stewart completed his report, *see* Ex. 19, Coxey advised the Commission that the transaction should be approved.  Stewart Tr. 142:23-144:4.

77.     Once again, however, the governor's office opposed the proposed agreement between Indiana Wholesale and E.F. Transit.  *See* Bedwell Tr. 85:10-22; Poindexter Tr. 33:21-

---

[5]  By contrast, the 2009 agreement required Commission approval because it involved moving Indiana Wholesale's warehouse to Pendleton Pike.  *See* ¶ 10, *supra*.

34:6.  And once again, the Commission chairman conveyed to the governor's office that the Commission would honor those objections.  *See* Bedwell Tr. 85:23-86:21.

78.    Huskey, by this time chairman of the Commission, told the governor's office that he believed the transportation agreement would give Indiana Wholesale and Monarch advantages that their competitors—including members of Wine and Spirits—did not possess.  Huskey Tr. 38:10-39:12.  But protecting competitors from market forces is not a legitimate purpose of the Commission, as the Commission's designated witnesses conceded.  Stewart Tr. 214:10-215:7; Bedwell Tr. 160:9-12; *see also* Ind. Code § 7.1-1-1-1 (listing purposes of Title 7.1).

79.    This time, the Commission did not reject the proposed agreement outright.  Instead, it declined E.F. Transit's request for an advisory opinion on the validity of the agreement.  *See* Ex. 49.  The Commission denied this request even though it regularly gives advice to the entities it regulates to help them conform their conduct to the law.  The Commission's designated witnesses both testified that the Commission and the Excise Police ordinarily maintain a cooperative relationship with these entities, preferring to give cautionary advice up front rather than issue citations after the fact.  Bedwell Tr. 87:19-91:2; Stewart Tr. 55:8-57:17.

80.    Even as the Commission refused to give an advisory opinion, it strongly suggested that it believed the transportation agreement was invalid.  In a letter to E.F. Transit, Huskey wrote:  "Although the Commission has some concerns about potential prohibited interests, it will not render legal advice to an alcoholic beverage permit holder.  The legalities of such a relationship should be thoroughly vetted with your attorney."  *See* Ex. 49.

81.    One of the Commission's designated witnesses characterized the letter as an admonition to "proceed at your own peril."  *See* Stewart Tr. 237:6-17; Ex. 50.

82.    E.F. Transit in fact thoroughly vetted the 2009 and 2012 agreements with two

prominent Indiana law firms, which concluded that the agreements complied with the Alcoholic Beverages Code.  *See* Exs. 51, 52.  But such advice would not have insulated either E.F. Transit or Indiana Wholesale from sanctions, including mandatory revocation of their permits, if the Commission reached a different conclusion.  *See* Stewart Tr. 237:18-238:5.

83.     In the view of Indiana Wholesale, the letter was tantamount to a denial.  In a note to E.F. Transit, Indiana Wholesale's chief executive wrote:  "This creates, at a minimum, substantial controversy over whether the provision and use of delivery services under the agreement is legally permissible, and substantial risk that proceeding under the agreement will lead to Commission action citing one or both of the parties for violating Indiana alcoholic beverage laws."  Ex. 53.

84.     In the face of the Commission's effective denial, Indiana Wholesale declined to proceed with the agreement.  But E.F. Transit and Indiana Wholesale remain interested in developing a "mutual, beneficial relationship" and continue to discuss potential agreements.  *See* Terry Tr. 132:6-19.

### K.     The Commission's Interest In Enforcing The Prohibited-Interest Statutes

85.     With respect to both the 2009 and 2012 contracts, the Commission concedes that all of the duties E.F. Transit and Indiana Wholesale had agreed to undertake were ordinary and appropriate duties for a carrier and a wholesaler, respectively.  *See* Bedwell Tr. 136:24-149:2, 180:7-195:18; Stewart Tr. 303:16-318:11, 101:24-113:1; Poindexter Tr. 80:11-90:6.  If Indiana Wholesale had entered those agreements with FedEx, UPS, or any other motor carrier not associated with a beer wholesaler, they would have been perfectly consistent with state law.  *See* Bedwell Tr. 118:25-120:25, 221:8-222:5; Stewart Tr. 35:2-25, 197:5-198:2; 230:19-231:4.

86.     The only reason E.F. Transit and Indiana Wholesale cannot proceed with these or similar agreements is that the Commission maintains that they would give Monarch a prohibited

interest in a liquor wholesaler's permit.  Bedwell Tr. 164:18-165:21; Tr. 195:19-196:11; Stewart Tr. 237:6-238:9.

87.     But the prohibited-interest statutes only forbid a beer wholesaler from acquiring an interest in a liquor wholesaler's permit.  *See* Ind. Code §§ 7.1-5-9-3, 7.1-5-9-4(2), 7.1-5-9-6. On their face, they do *not* bar a transportation company affiliated with a beer wholesaler from entering into a services agreement with a liquor wholesaler for a flat, commercially reasonable fee.  By interpreting these statutes to bar E.F. Transit's agreement with a liquor wholesaler, the Commission has precluded conduct that the legislature did not obviously intend to prohibit.

88.     The Commission takes the position that, although Monarch and E.F. Transit are separate and distinct "as a matter of corporate law," they are a single entity for purposes of alcohol regulation.  Bedwell Tr. 197:12-199:18.

89.     But no provision of Title 7.1 permits the Commission to treat as the same corporations that the State otherwise recognizes as separate and distinct.  Nor, before this case, had the Commission ever done so.  *See* Bedwell 172:1-173:9.  To the contrary, the Commission has a long history not only of permitting regulated parties to form separate corporations in order to perform transactions that would otherwise create a prohibited interest, but of *recommending* that solution to them.  *See* Bedwell Tr. 199:14-200:8; Coxey Tr. 39:20-41:20..

90.     One of the Commission's designated witnesses testified that the 2009 and 2012 agreements would give Monarch a prohibited interest in Indiana Wholesale's liquor permit because "Monarch and EFT are both—in the eyes of 7.1, are both, for permit purposes, the same in that they would also have control with" Indiana Wholesale.  *See* Bedwell Tr. 197:19-21.  But the witness acknowledged that neither Monarch nor E.F. Transit would control either the suppliers or customers with which Indiana Wholesale does business, or the prices Indiana Wholesale

22

charges for its products.  *See id.* at 209:9-210:4.  Nor would either company share in Indiana Wholesale's profits.  *See id.* at 203:10-24.

91.     The same witness eventually conceded that neither Monarch nor E.F. Transit would control Indiana Wholesale's finances or operations in any way:  "I would say that there is a connection, maybe not a control."  Bedwell Tr. 198:14-22.  But the only "connection" between Monarch and Indiana Wholesale is that they would share the same warehouse and motor carrier—as they are authorized by state law to do.  *See id.* at 201:24-202:11.

92.     The Commission's designated witnesses conceded that applying the prohibited interest provisions to the transportation services at issue in this case would bring no benefit to the State.  *See* Bedwell Tr. 162:3-6; Stewart Tr. 225:19-226:16, 286:15-21.  It would not serve the State's interests in promoting temperance, bolstering the morals of its citizens, preventing underage drinking, improving public safety, and maintaining records of alcohol sales and transportation.  *See* Bedwell Tr. 162:7-164:12; Stewart Tr. 229:19-232:17.  Rather, as one witness put it, the State's only interest was in "enforcing the law at its face" so that "everyone knows that the law is going to be enforced."  Stewart Tr. 225:19-226:16, 286:15-21.

93.     Coxey, the Commission's former staff attorney who was a commissioner herself at the time of her deposition, similarly testified that barring the transportation services at issue in this case did not serve any purpose with respect to the regulation or distribution of alcohol in Indiana.  *See* Coxey Tr. 62:6-13; 105:2-7.

## ARGUMENT

The FAAAA precludes the Commission from invoking Indiana's prohibited-interest statutes to bar E.F. Transit from providing transportation services to liquor wholesalers.  The Commission has enforced, and will continue to enforce, the prohibited-interest statutes in a manner that interferes with the "routes" and "services" E.F. Transit wishes to provide "with respect to

the transportation of property."  49 U.S.C. § 14501(c)(1).  The Twenty-first Amendment, more-over, provides the Commission no escape from the FAAAA's broad preemptive sweep.  Although the Twenty-first Amendment ordinarily requires a balancing in cases where the federal interest in regulating commerce collides with the state interest in regulating alcohol, no such balancing is appropriate here because the Commission has conceded that no legitimate state interest is served by prohibiting the types of transportation agreements at issue in this case.  This Court should therefore grant summary judgment in E.F. Transit's favor.

I.   **THE FAAAA HAS A BROAD SWEEP THAT PREEMPTS STATE LAWS HAV-ING A SIGNIFICANT IMPACT RELATED TO PRICES, ROUTES, OR SER-VICES OF A MOTOR CARRIER**

In the late 1970s, Congress embarked on what would become a decades-long program to deregulate the airline and trucking industries.  Congress believed that those industries had come to exert excessive influence over the federal agencies that regulated them, creating a business climate that protected incumbents.  *See S.C. Johnson & Son, Inc.* v. *Transport Corp. of America, Inc.*, 697 F.3d 544, 548 (7th Cir. 2012).  With the support of the Carter Administration, Congress began relaxing federal regulation of those industries in order to promote competition.  *Id.*

As part of this effort, Congress passed the FAAAA to displace state laws that were undermining the federal deregulatory agenda and placing unreasonable burdens on free trade and interstate commerce.  *See Dan's City Used Cars, Inc.* v. *Pelkey*, 133 S. Ct. 1796, 1775 (2013); *Massachusetts Delivery Ass'n* v. *Coakley*, 769 F.3d 11, 21 (1st Cir. 2014).  Of particular note here, the FAAAA contains an express preemption provision providing that "a State  .  .  .  may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier  .  .  .  with respect to the transportation of property."  49 U.S.C. § 14501(c)(1).

That preemption provision has "an expansive sweep," *Morales* v. *Trans World Airlines,*

*Inc.*, 504 U.S. 374, 383-384 (1992),[6] superseding any state law that has "a significant impact related to Congress's deregulatory and pre-emption-related objectives," *Rowe* v. *New Hampshire Motor Transportation Ass'n*, 552 U.S. 364, 371 (2008) (internal quotation marks omitted). The FAAAA displaces not only state laws specifically addressed to the trucking industry, but also laws of general applicability that have either a direct or indirect effect on the prices, routes, or services offered by a motor carrier with respect to the transportation of property. *Morales*, 504 U.S. at 386; *S.C. Johnson*, 697 F.3d at 550. Although laws having "only a tenuous, remote, or peripheral" effect on the trucking industry may escape preemption, the FAAAA necessarily preempts any law or regulation affecting "essential details of a motor carrier's system for picking up, sorting, and carrying goods." *Rowe*, 552 U.S. at 371, 373. As the Supreme Court has explained, "[t]he target at which [the FAAAA] aimed was a State's direct substitution of its own governmental commands for competitive market forces in determining (to a significant degree) the services that motor carriers will provide." *Dan's City Used Cars*, 133 S. Ct. at 1780.

In this case, the FAAAA preempts the Commission's application of the prohibited interest statutes to bar E.F. Transit from providing warehousing and delivery services to a liquor wholesaler because the Commission has (1) "enforce[d] a law" (2) "related to a price, route, or service" of a motor carrier "with respect to the transportation of property," and (3) no statutory exception to the FAAAA's broad preemptive reach applies. 49 U.S.C. § 14501(c). We address each of those requirements in turn.

### A.   The Commission Has Enforced And Will Continue To Enforce Indiana's Prohibited-Interest Statutes Against E.F. Transit

Because the FAAAA does not define "enforce," the word must be given its ordinary

---

[6] *Morales* interpreted the Airline Deregulation Act of 1978, but that statute's preemption provision "is in pertinent part identical" to the FAAAA's, and the two are "generally construed in pari materia." *Tobin* v. *Federal Express Corp.*, 775 F.3d 448, 454 n.4 (1st Cir. 2014).

meaning. *See Mohamad* v. *Palestinian Authority*, 132 S. Ct. 1702, 1706 (2012). In common

parlance, to "enforce" means to "put in force," "cause to take effect," "give effect to," *Webster's*

*Third New International Dictionary* 751 (2002), or "compel observance of or compliance with,"

*New Oxford American Dictionary* 574 (3d ed. 2010). In this case, the Commission has given

effect to Indiana's prohibited-interest statutes, Indiana Code §§ 7.1-5-9-3, 7.1-5-9-4(2), 7.1-5-9-

6, by frustrating business transactions that it (wrongly) believes violate those statutes.

 Although the Commission never took a formal vote on the 2009 agreement, it construc-

tively denied Indiana Wholesale's transfer application, first by delaying action on the petition

and later by informing Indiana Wholesale that it planned to issue a denial. Once Indiana Whole-

sale had filed its application, the Commission waited more than five months to order an Excise

Police investigation and nearly seven months to hold a hearing at which Indiana Wholesale could

present its arguments. As the Commission's witnesses acknowledged, delays by state regulators

are often tantamount to a denial, especially where they risk thwarting time-sensitive business

transactions. *See* Stewart Tr. 283:6-20; Snow Tr. 67:15-70:1; Dunsmore Tr. 27:16-28:8; *cf.*

*Thomas* v. *Nicholson*, 561 F. Supp. 2d 1, 5 n.3 (D.D.C. 2008) (describing a statutory scheme

recognizing an agency's failure to act as a constructive denial). In this case, Indiana Wholesale's

lease at its existing warehouse expired as it was waiting for the Commission to rule; in the ab-

sence of a ruling, Indiana Wholesale was forced to renew its lease, effectively scuttling its

agreement with E.F. Transit until its lease expired again. *See* Exs. 41, 45.

 The Commission's actions left no doubt that it would have denied the 2009 application if

Indiana Wholesale had not withdrawn it. Officer Swallow's report, produced at the Commis-

sion's direction, concluded that the agreement between Indiana Wholesale and E.F. Transit

would violate numerous provisions of the Indiana Code. And even when E.F. Transit presented

him with information that contradicted many of his conclusions, Officer Swallow declined to make corresponding amendments to his report.  Not long after Officer Swallow issued his supplemental report, Snow informed Indiana Wholesale that the Commission would deny its application.  *See* Terry Tr. 96:11-17.  If Indiana Wholesale had waited for the Commission to take this adverse action, it would have placed in jeopardy liquor permits held by its parent company in other States.  *See* Bedwell Tr. 225:5-226:11; Coxey Tr. 81:18-82:16.  As a practical matter, therefore, Indiana Wholesale's decision to withdraw the application was involuntary; withdrawal was the only means by which Indiana Wholesale could shield its parent company from potentially devastating consequences for its liquor business in other States.  By confronting Indiana Wholesale with the inevitable denial of its application, the Commission "gave effect to" or "compelled compliance with" the prohibited-interest provisions—that is, it "enforced" them.

As for the 2012 agreement, the Commission once again told E.F. Transit and Indiana Wholesale to proceed at their own peril.  *See* Stewart Tr. 237:6-17; Ex. 50.  Although the Commission declined to give an advisory opinion concerning this transaction, it informed the companies that it had "concerns about potential prohibited interests."  Ex. 49.  Had the companies implemented the transportation agreement, they faced a grave risk that the Commission would find that E.F. Transit's relationship with Indiana Wholesale in fact gave Monarch a prohibited interest in a liquor wholesaler's permit.  And if the Commission had made that finding, both Monarch and Indiana Wholesale would have suffered mandatory revocation of their wholesaler's permits and even potential criminal charges.  *See* Ind. Code §§ 7.1-3-23-23, 7.1-5-9-3, 7.1-5-9-4 (penalty provisions).  Faced with such ruinous consequences, the companies had no rational choice but to walk away from the agreement.

To the extent these proceedings left any ambiguity about whether the Commission be-

27

lieved E.F. Transit's agreements—or any similar services agreements that E.F. Transit might seek to enter in the future—gave Monarch a prohibited interest in a liquor wholesaler's permit, the deposition testimony in this case resolves it.  The two witnesses who testified on behalf of the Commission confirmed that the agency currently believes that *both* the 2009 and 2012 agreements violated the prohibited-interest statutes.  *See* Bedwell Tr. 195:196:7, 197:19-21; Stewart Tr. 113:15-114:18.  Thus, if E.F. Transit consummates a similar agreement with Indiana Wholesale or another liquor wholesaler in the future, as it wishes to do, it faces certain and severe sanctions at the hands of the Commission.  Such an exercise of the police power is the quintessential "enforcement" of a state law preempted by the FAAAA.  And it is against this threatened enforcement that E.F. Transit seeks prospective injunctive and declaratory relief.  *See Shaw* v. *Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983); *Ex parte Young*, 209 U.S. 123, 155-156 (1908).

**B.   The Threatened Enforcement Of Indiana's Prohibited-Interest Statutes Is "Related To A Price, Route, Or Service" Of A Motor Carrier "With Respect To The Transportation Of Property"**

A state law, including a law of general applicability, "relates to" a carrier's rates, routes, or services if it has either a "connection" with them, *Northwest, Inc.* v. *Ginsberg*, 134 S. Ct. 1422, 1428 (2014) (brackets omitted), or a "significant impact" on them, *Rowe*, 552 U.S. at 375 (emphasis omitted), in derogation of Congress's broad deregulatory agenda.  That standard is satisfied where the state law requires a motor carrier to provide a service that the market would not otherwise support (or prevents the carrier from offering a service that the market otherwise would).  *Id.* at 372-373; *Lebamoff Enterprises, Inc.* v. *Huskey*, 666 F.3d 455, 457 (7th Cir. 2012).

The FAAAA broadly defines a motor carrier's services to include "receipt, delivery, elevation, transfer in transit, . . . storage, handling, packing, unpacking, and interchange of . . . property."  49 U.S.C. § 13102(23)(B).  It further specifies that protected modes of "transportation" include not only motor vehicles, but any "warehouse" or "yard" operated by a motor

carrier and "equipment of any kind related to the movement of . . . property." 49 U.S.C. § 13102(23)(A). The statute thus protects not only "trucking" itself, but the host of services that a motor carrier might provide to improve the efficiency or lower the costs of its operations.

In this case, the Commission has interpreted the prohibited-interest statutes to bar E.F. Transit from warehousing and transporting products for liquor wholesalers. There can be no doubt that warehousing and delivery are quintessential "service[s] of a[] motor carrier . . . with respect to the transportation of property." 49 U.S.C. § 14501(c)(1). Indiana Wholesale wished to transfer its warehouse to Pendleton Pike in order to take advantage of E.F. Transit's state-of-the-art sorting and loading equipment and its ability to accommodate expansion by Indiana Wholesale. By doing so, Indiana Wholesale could have improved the efficiency of its deliveries. The agreement was precisely the sort of market-driven solution that federal deregulation of the trucking industry was designed to encourage. More generally, there can be no question here that there is a market for E.F. Transit to provide transportation services to liquor wholesalers and that the Commission has made clear that it will not permit E.F. Transit to provide those services. By applying Indiana's prohibited-interest statutes to block these sorts of transactions, the Commission has "substitut[ed] its own governmental commands for competitive market forces in determining (to a significant degree) the services that motor carriers will provide"— exactly what the FAAAA was designed to prevent. *Dan's City Used Cars*, 133 S. Ct. at 1780.

## C.     No Exception To FAAAA Preemption Applies Here

The FAAAA excepts certain state laws from its preemptive sweep. *See* 49 U.S.C. § 14501(c)(2)-(5). The largest and most important of those exceptions is for state regulations concerning motor vehicle safety. *Id.* § 14501(c)(2)(A). But the Commission has no plausible argument that any of those exceptions applies in this case. To the contrary, the Commission has specifically disclaimed that enforcement of the prohibited-interest statutes against E.F. Transit

serves the State's interest in promoting public safety.  *See* Bedwell Tr. 162:3-22; Stewart Tr. 229:19-20, 232:2-3.  And it has further admitted that none of the other statutory exceptions applies.  Bedwell Tr. 162:3-164:12; Stewart Tr. 231:15-232:17.

<div align="center">*     *     *     *     *</div>

In the ordinary course, the preemption analysis would end here.  Where the challenged state regulation concerns alcohol, however, the Twenty-first Amendment may require a balancing of federal and state interests.  In this case, such a balancing is neither necessary nor appropriate because the Commission's interests in enforcing the prohibited interest statutes against E.F. Transit do not fall within a "core power conferred on the states by section 2 of the Twenty-first Amendment."  *Lebamoff Enterprises*, 666 F.3d at 458.

## II.   THE TWENTY-FIRST AMENDMENT DOES NOT ALTER THE PREEMPTION ANALYSIS HERE

Section 2 of the Twenty-first Amendment "reserves to the States power to impose burdens on interstate commerce in intoxicating liquor that, absent the Amendment, would clearly be invalid under the Commerce Clause."  *Capital Cities Cable, Inc.* v. *Crisp*, 467 U.S. 691, 712 (1984); *see also Stawski Distributing Co.* v. *Browary Zywiec S.A.*, 349 F.3d 1023, 1026 (7th Cir. 2003).  At the same time, the Twenty-first Amendment does not "oust[] the Federal Government of all jurisdiction over interstate traffic in liquor," *Capital Cities*, 467 U.S. at 713, including the right to regulate licensed motor carriers engaged in the transportation of alcohol.  Instead, where federal regulation of interstate commerce collides with an exercise of a State's "core power" under the Twenty-first Amendment, *Lebamoff Enterprises*, 666 F.3d at 458, the Supreme Court requires a balancing of the relevant federal and state interests, *see 324 Liquor Corp.* v. *Duffy*, 479 U.S. 335, 346-347 (1987).  That balancing test asks "whether the interests implicated by a state regulation are so closely related to the powers reserved by the Twenty-first Amendment that the

<div align="center">30</div>

regulation may prevail, notwithstanding that its requirements directly conflict with express federal policies." *Id.*

In examining the asserted state interest, courts require evidence that the challenged law actually advances that interest. *See 324 Liquor*, 479 U.S. at 350; *Cal. Retail Liquor Dealers Ass'n* v. *Midcal Aluminum, Inc.*, 445 U.S. 97, 113-114 (1980); *US Airways, Inc.* v. *O'Donnell*, 627 F.3d 1318, 1331 (10th Cir. 2010). Thus, unlike in the context of rational-basis review, the Commission must do more than posit a rational relationship between the challenged law and a hypothetical state interest; it must make a showing that the law actually advances that interest.

### A.    No Balancing Is Required Because The Commission's Interests In This Case Are Not Closely Related To The Powers Reserved By The Twenty-First Amendment

The Twenty-first Amendment does not mandate a balancing of federal and state interests in this case because the Commission's enforcement of the prohibited interest statutes against E.F. Transit does not serve any interest "closely related" to that Amendment. *324 Liquor*, 479 U.S. at 346-347. E.F. Transit does not dispute that, as a general matter, Indiana has a cognizable interest in regulating the motor carriers that transport and deliver alcoholic products around the State. *See North Dakota* v. *United States*, 495 U.S. 423, 432-433 (1990). In this case, however, the Commission has restrained E.F. Transit from engaging in activities that it concedes are ordinarily permitted. Indiana allows motor carriers to lease space in the same warehouse to beer and liquor wholesalers, provided the wholesalers have separate suite numbers and maintain physical separation of their products. *See* Stewart Tr. 35:2-25. And it authorizes motor carriers to transport beer, liquor, and wine products on the same trucks. *See* Stewart Tr. 86:9-87:9. Here, the Commission has barred E.F. Transit from these activities by applying prohibited-interest statutes that regulate not motor carriers, but *wholesalers*.

The Commission makes this leap by disregarding corporate formalities and treating E.F.

Transit and its sister company, Monarch Beverage, as if they were one and the same.   But the Commission has no basis for conflating two corporations that the State otherwise recognizes as separate and distinct, nor does it have a past practice of doing so.   To the contrary, the Commission's own witnesses testified that the Commission has a longstanding practice of acknowledging corporate separateness and permitting sister companies to engage in transactions that would be forbidden if conducted by a single entity.   *See* Bedwell Tr. 166:2-169:15, 175:8-18; Stewart Tr. 96:25-100:12.   This case, in fact, is the only exception to that practice.   *See* Bedwell Tr. 173:5-9. The Commission's witnesses could offer no coherent justification for ignoring the corporate form in this case, and instead fell back on the unsupported assertion that E.F. Transit and Monarch, though separate "as a matter of corporate law," should be treated as a single entity for purposes of alcohol regulation.   *See* Bedwell Tr. 199:14-18; Stewart Tr. 114:14-115:8.

But the Commission's witnesses could identify *no* state interest related to the sale or distribution of alcohol that is served by disregarding the corporate form in this situation.   As these witnesses conceded, applying the prohibited interest statutes to forbid E.F. Transit from providing transportation services to a liquor wholesaler at commercially reasonable rates would not bolster public morals, discourage overconsumption of alcohol, prevent underage drinking, improve public safety, or assist the Commission in overseeing the movement of alcohol around the State.   Bedwell Tr. 162:7-164:12; Stewart Tr. 229:19-232:17.

The record discloses the real reason that the Commission found these service agreements objectionable:   Although the Commission initially blessed the agreement between E.F. Transit and Indiana Wholesale as fully consistent with state law, it reversed course after well-connected competitors of Monarch and Indiana Wholesale convinced the governor's office to torpedo the proposal.   *See* Exs. 27, 31.   But the Twenty-first Amendment does not permit the Commission to

engage in "economic boosterism" of favored competitors "in the guise of a law aimed at alcoholic beverage control." *Beskind* v. *Easley*, 325 F.3d 506, 517 (4th Cir. 2003); *accord Dickerson* v. *Bailey*, 336 F.3d 388, 406-407 (5th Cir. 2003).  Nor, indeed, does the Twenty-first Amendment empower the Commission to exceed the limits of its own authority.  The Alcoholic Beverages Law expressly forbids the Commission from taking action on "arbitrary, capricious, or political grounds."  Ind. Code § 7.1-3-23-30.  Yet there is no dispute in this case that the Commission changed its position on the E.F. Transit-Indiana Wholesale agreement after the governor's office intervened at the behest of competitors and communicated its vigorous opposition.

Because the Commission has admitted that it has no legitimate interest in applying the prohibited interest statutes to bar the transactions at issue in this case, the Commission is not entitled to Twenty-first Amendment balancing.  Its arbitrary and unreasonable application of the prohibited-interest statutes must yield to the legitimate federal interest in deregulating the trucking industry.

> **B.** **Should Balancing Be Required, The Federal Interest In Deregulating The Trucking Industry Should Prevail Over The State's Nonexistent Interest In Enforcing The Prohibited-Interest Statutes Against E.F. Transit**

To the extent the Court concludes Twenty-first Amendment balancing is nevertheless necessary, the Commission's nonexistent interest in applying the prohibited-interest statutes to prevent a licensed motor carrier from providing transportation services cannot overcome the powerful federal interest in deregulating the trucking industry.

Even when the prohibited-interest statutes that preclude a beer wholesaler from having an interest in a liquor wholesale permit are applied to the right target—wholesalers—they have no actual justification.  Those statutes, which are unique to Indiana, are a relic of a 1930s-era patronage system in which state lawmakers controlled liquor licenses and county lawmakers doled out beer licenses.  *See* Ex. 11.  As one of the Commission's designated witnesses acknowledged,

today these statutes serve no discernible purpose, but are enforced only because "that's the law." Stewart Tr. 69:6-25.  If those statutes were repealed, it would not impair the Commission's abil-ity to carry out state alcohol policies or enforce other provisions of the Alcoholic Beverages Law.  *See* Stewart Tr. 70:16-71:3.  Although the Commission's other designated witness hypoth-esized a justification for these statutes—ensuring that a single company would not come to dom-inate the wholesale tier—he conceded that there is no evidence that the statutes actually advance that goal.  Bedwell Tr. 102:24-103:14; *see US Airways*, 627 F.3d at 1331 (observing that, for the State to prevail in the preemption analysis, its regulatory regime must *in fact* serve its purpose).

And the State has *no* interest in applying the general prohibited-interest provisions to the transportation services that E.F. Transit seeks to provide.  As previously noted, these statutes forbid beer wholesalers from acquiring an interest in a liquor wholesaler's permit.  In this case, however, the Commission is enforcing the statutes against a transportation company that neither is a beer wholesaler nor performs functions that must be performed by a beer wholesaler.  As the Commission's designated witnesses conceded, under both the 2009 and 2012 agreements, E.F. Transit would perform only a carrier's duties, while all functions a wholesaler must perform would remain with Indiana Wholesale.  *See* Bedwell Tr. 213:20-23; Stewart Tr. 314:25-318:11. E.F. Transit would provide these services for a flat, commercially reasonable fee—it would not share in Indiana Wholesale's profits or take any other interest in the liquor Indiana Wholesale sold.  *See* Bedwell Tr. 151:12-153:10; Stewart 106:7-24.  Yet the Commission asserts that this conduct is prohibited because it somehow gives Monarch, owned by the same shareholders as E.F. Transit, an interest in Indiana Wholesale's liquor permit.

Under no reasonable interpretation of these statutes could E.F. Transit—much less Mon-arch—be said to acquire an interest in Indiana Wholesale's liquor permit.  Of course, the Com-

34

mission is permitted to interpret and enforce state law as it chooses, except where doing so violates a company's federal rights.  Here, the Commission's designated witnesses *admitted* that enforcing those statutes to prevent E.F. Transit from warehousing and transporting products for a liquor wholesaler—rights secured to E.F. Transit under the FAAAA—would do *nothing* to advance the State's interests in promoting temperance, bolstering the morals of its citizens, improving public safety, and monitoring the distribution of alcohol around the State.  *See* Bedwell Tr. 162:7-164:12; Stewart Tr. 229:19-232:17; *cf. North Dakota*, 495 U.S. at 432 (recognizing those interests as core Twenty-first Amendment interests).  One of the Commission's designated witnesses could not identify *any* interest in alcohol regulation served by applying the prohibited interest statutes to these transportation services.  Bedwell Tr. 162:3-6.[7]  And the other designated witness identified the *only* state interest  as "enforcing the law at its face" so that "everyone knows that the law is going to be enforced."  Stewart Tr. 225:19-226:16, 286:15-21.

Even ignoring the fact that the prohibited-interest statutes, on their face, do not mandate the contorted interpretation the Commission is advancing here, the State must have some justification or purpose for the law beyond the mere fact of the law itself.  *See Thompson* v. *Gallagher*, 489 F.2d 443, 447-448 (5th Cir. 1973).  The Commission's tautological assertion that its interest in the law is in enforcing the law cannot overcome the strong federal interest in deregulating the trucking industry.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment should be granted.

---

[7]  Officer Bedwell was the designated witness identified to testify about the Commission's defenses.  Ex. 54 (Notice of deposition); Bedwell Tr. 67:25-68:11.

/s Kannon K. Shanmugam
Barry Simon (*pro hac vice*)
Kannon K. Shanmugam (*pro hac vice*)
Allison B. Jones (*pro hac vice*)
Amy Mason Saharia (*pro hac vice*)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000

David K. Herzog (Atty. No. 1583-49)
A Scott Chinn (Atty. No. 17903-49)
J. Murray Clark (Atty No. 4045-49)
Anne K. Ricchiuto (Atty. No. 25760-49)
FAEGRE BAKER DANIELS LLP
300 North Meridian Street, Suite 2700
Indianapolis, IN 46204
 (317) 237-0300

*Counsel for Plaintiff E.F. Transit, Inc.*

April 10, 2015

36

**CERTIFICATE OF SERVICE**

I, Kannon K. Shanmugam, counsel for E.F. Transit, Inc., certify that, on April 10, 2015, a copy of the foregoing Memorandum in Support of Plaintiff's Motion for Summary Judgment was filed via the Court's electronic filing system and served via that system upon all parties required to be served.

<div align="center" style="margin-left:40%">

s/ Kannon K. Shanmugam
Kannon K. Shanmugam

</div>