UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| E. F. TRANSIT, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:13-cv-01927-RLY-MJD |
| | ) | |
| INDIANA ALCOHOL AND TOBACCO | ) | |
| COMMISSION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| E. F. TRANSIT, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| DAVID COOK, in his official capacity as | ) | 1:15-cv-940-RLY-MJD |
| Chairman of the Indiana Alcohol and | ) | (consolidated) |
| Tobacco Commission; DAVID | ) | |
| COLEMAN, in his official capacity as Vice | ) | |
| Chairman of the Indiana Alcohol and | ) | |
| Tobacco Commission; DALE GRUBB, in | ) | |
| his official capacity as Commissioner of the | ) | |
| Indiana Alcohol and Tobacco Commission; | ) | |
| and MARJORIE MAGINN, in her official | ) | |
| capacity as Commissioner of the Indiana | ) | |
| Alcohol and Tobacco Commission, | ) | |
| | ) | |
| Defendants. | ) | |

**ENTRY ON PENDING MOTIONS**

Plaintiff, E. F. Transit, Inc. ("Plaintiff" or "EFT"), is a federally licensed motor

carrier engaged in transporting goods primarily for the alcoholic beverage industry.  Its

1

largest customer, Monarch Beverage Company, is a beer and wine wholesaler owned by the same shareholders as EFT.  EFT wishes to provide transportation services to Indiana Wholesale Wine and Liquor Company, but claims the Defendants, the Indiana Alcohol and Tobacco Commission ("ATC" or "Commission") and its Commissioners, have blocked it from doing so pursuant to state statutes that prohibit a beer wholesaler from having an interest in a liquor wholesaler's permit.  *See* Indiana Code §§ 7.1-5-9-3, 7.1-5-9-4(2) and 7.1-5-9-6 (the "Prohibited Interest Statutes").

In this action, EFT seeks declaratory and injunctive relief under the Federal Aviation Administration Authorization Act ("FAAAA") to prevent Defendants from invoking Indiana's Prohibited Interest Statutes to bar it from providing transportation services to liquor wholesalers.  Presently, there are six motions before the court: (1) Plaintiff's Motion for Summary Judgment; (2) Plaintiff's Motion for Oral Argument on Motion for Summary Judgment; (3) Defendants' Cross-Motion for Summary Judgment; (4) Indiana Beverage Alliance's Motion for Leave to Appear as *Amicus Curiae* and to File Brief in Support of the State; (5) Wine & Spirits' Motion for Leave to File *Amicus Curiae* Brief in Support of Defendants' Cross-Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment; and (6) Plaintiff's Motion for Leave to Supplement Designations of Evidence in Support of Motion for Summary Judgment and in Opposition to Defendants' Cross-Motion for Summary Judgment.  For the reasons explained below, the court (1) **GRANTS** Plaintiff's Motion for Leave to Supplement Designations of Evidence; (2) **DENIES as MOOT** Plaintiff's Motion for Oral Argument; (3) **DENIES** the Plaintiff's Motion for Summary Judgment; (4)

**GRANTS** the Defendants' Cross-Motion for Summary Judgment; (5) **DENIES as MOOT** Indiana Beverage Alliance's Motion for Leave to Appear as *Amicus Curiae* and to File Brief in Support of the State; and (6) **DENIES as MOOT** Wine & Spirits' Motion for Leave to File *Amicus Curiae* Brief in Support of Defendants' Cross-Motion for Summary Judgment.

## I.      Motion for Leave to Supplement

Before addressing the facts relevant to the present motion, the court will first address EFT's motion for leave to supplement its designations of evidence with Exhibit 65, which is an excerpt of a footnote in a brief filed by the ATC in a judicial review state proceeding on April 26, 2016, after the summary-judgment briefing in this case was completed.  According to EFT, Exhibit 65 shows that the Commission actually "made a determination" that EFT's proposed relationship with Indiana Wholesale would violate the Prohibited Interest Statutes.  In pertinent part, the footnote reads:

> This same type of evidence on 'formal corporate separateness' was presented by EFT in prior matters before the Commission and was not considered material to the Commission's determination that there would be prohibited interests in the proposed arrangements.

(Filing No. 177-1, ATC's brief in *Spirited Sales, LLC v. Ind. Alcohol and Tobacco Comm.*, Cause No. 49D01-1502-PL-005220, Marion Super. Ct. April 26, 2016, at 15 n. 25).  Defendants do not dispute the admissibility of the footnote, but maintain the argument contained in the brief "speaks for itself."  The court will therefore **GRANT** Plaintiff's motion for leave.

3

## II.      Background

### A.      Indiana's Alcohol Regulation System

Indiana regulates the production, sale, and distribution of alcoholic beverages through its Alcoholic Beverages Law, found at Title 7.1 of the Indiana Code.  The ATC, through the Commissioners, is charged with enforcing the law.  *See* Ind. Code §§ 7.1-2-3-2, 7.1-2-1-11.

Like most other states, Indiana adopted a three-tier system for regulating the production, distribution, and sale of alcohol.  The first tier consists of brewers, vitners, and distillers who manufacture alcoholic products.  *See id.* §§ 7.1-3-2-7, 7.1-3-7-7, 7.1-3-12-2.  The second tier is composed of wholesalers who purchase alcoholic products from the manufacturers and sell them to the retailers and dealers.  *See id.* §§ 7.1-3-3-5, 7.1-3-8-3, 7.1-3-13-3.  The third tier is composed of retailers and dealers who sell alcoholic products directly to consumers.  *See id.* §§ 7.1-3-4-6, 7.1-3-10-7, 7.1-3-15-3.  Except in certain specified circumstances, no business may operate in more than one tier, *see id.* §§ 7.1-5-9-9, 7.1-5-9-10(a), and a state-issued permit is required for every business at any tier—whether as a manufacturer, wholesaler, or retailer of alcohol, *id.* § 7.1-3 *et seq.*

This case focuses on the second tier: the wholesalers.  At the wholesale level, the Commission issues three types of permits: a beer wholesaler's permit, *see id.* § 7.1-3-3-1; a wine wholesaler's permit, *see id.* § 7.1-3-13-1; and a liquor wholesaler's permit, *see id.* § 7.1-3-8-1.  Under Indiana's Prohibited Interest Statutes, a wholesaler may possess (1) either a beer, wine, or liquor permit, (2) a beer and wine permit, or (3) a wine and liquor permit.  A wholesaler may not, however, hold both a beer and a liquor permit.  *Id.* §§ 7.1-

4

3-3-19, 7.1-3-13-1, 7.1-5-9-4.  Thus, the holder of a beer wholesaler permit cannot hold a direct or indirect interest in a liquor wholesaler permit and vice versa.  *Id.* §§ 7.1-5-9-3, 7.1-5-9-4(a)(2), 7.1-5-9-6, 7.1-1-2-5 ("[W]henever a person is prohibited from doing a certain act or holding a certain interest directly, he shall be prohibited from doing that act or holding that interest indirectly.").  A beer wholesaler found to be in violation of the Prohibited Interest Statutes faces mandatory revocation of its permit.  *Id.* § 7.1-3-23-23.

The ATC also regulates the warehousing facilities used by wholesalers.  Indiana prohibits beer and liquor wholesalers from maintaining any warehouse other than the one described in their permits.  *See id.* § 7.1-5-9-12.  Thus, if a wholesaler wishes to change the location of its warehouse, it must apply to the Commission.  In addition, wine and liquor wholesalers may house their alcohol products in the same warehouse so long as they have different addresses—even if that means only different suites or rooms in the building—and maintain physical separation of their products. (*See* Filing No. 163-1, Deposition of Scott Bedwell ("Bedwell Dep.") at 119-20; Filing No. 163-2, Deposition of Brian Stewart ("Stewart Dep.") at 77-78; Filling No. 167-6, Deposition of David Cook ("Cook Dep.") at 110).

Lastly, Indiana regulates motor carriers engaged in the transportation and delivery of alcoholic beverages.  Any motor carrier that wishes to "haul, convey, transport, or import alcoholic beverages" on state highways must obtain a carrier's permit.  *See* Ind. Code § 7.1-3-18-3.  A carrier's permit enables a motor carrier to transport all three types of alcoholic beverages.  *See id.* § 7.1-3-18-2; (Bedwell Dep. at 127-28; Cook Dep. at 100).  Motor carriers may transport alcohol products for more than one manufacturer or

5

wholesaler.  (Filing No. 163-3, Deposition of Robin Poindexter ("Poindexter Dep.") at 25-26).

**B.  EFT**

EFT is a trucking company licensed by the ATC to transport beer, wine, and liquor.  (Filing No. 163-10, Deposition of Phillip Terry ("Terry Dep.") at 11, 25; Filing No. 163-15, Carrier's Permit).  EFT has been in business since 1996 and employs approximately 380 people.  (Terry Dep. at 11, 24).  EFT also operates a 500,000-square-foot warehouse at 9347 Pendleton Pike in Indianapolis.  (Filing No. 163-53, Declaration of Phillip A. Terry ¶¶ 4-5).  It subleases space in its warehouse to Monarch Beverage, a beer and wine wholesaler, for which it also provides delivery services.  (Terry Dep. at 23).

Phillip Terry is CEO of both E.F. Trucking and Monarch.  (*Id.* at 10-11).  Although EFT and Monarch are separate corporate entities, the two companies share the same shareholders, board of directors, and address.  (*Id.* at 17-18, 35-36, 77-78).  They also share approximately 20 employees.  (*Id.* at 36).

**C.  2009 Tentative Agreement with Indiana Wholesale**

In 2009, EFT reached a tentative agreement to lease additional space in the warehouse and to provide transportation services to Indiana Wholesale Wine & Liquor Company, an Indiana liquor and wine wholesaler.  (Filing No. 163-18, 2009 Lease Agreement; Filing No. 163-19, 2009 Services Agreement).  Pursuant to the Services Contract, EFT would obtain product from manufacturers and suppliers and take the product to the warehouse on Pendleton Pike, where it would be placed in storage and then

loaded into sorting equipment.  (Terry Dep. at 55-56; 2009 Services Agreement).  The product would be packaged with Monarch's product that was going to the same retailer or dealer.  (Terry Dep. at 92-93).

On May 22, 2009, Melissa Coxey, Staff Attorney for the ATC, evaluated the proposed agreement.  The overlapping ownership of EFT and Monarch was noted as an area of concern: "Would this provide an indirect prohibited interest between Monarch as a beer wholesaler and Indiana Wholesale as a liquor wholesaler? That is a question for the commission."  (Filing No. 163-25, Coxey Email dated May 22, 2009).

After learning of the proposed Services Agreement, Jim Purucker, executive director of Wine and Spirits Distributors of Indiana, contacted ATC Chairman Thomas Snow to express opposition to the proposed agreement.  (Filing No. 163-26, Email from Chairman Snow dated July 2, 2009).  At Chairman's Snow's request, Purucker submitted a memorandum, with citations to the Indiana Code, outlining the legal reason why the Services Agreement would contravene the Prohibited Interest Statutes and the public policy of Indiana.  (Filing No. 163-28, Purucker Email with attached letter dated July 16, 2009).  Apparently after reading the Purucker memorandum, Jessica Norris, the Policy Director for Regulatory & Administrative Affairs for the Office of the Governor, informed the Commission that the Governor's Office was opposed to Commission approval of the proposed agreement.  (Bedwell Dep. at 249-52; Deposition of Melissa Coxey ("Coxey Dep.") at 53-54; Filing No. 163-32, Email from Chairman Snow dated Sept. 16, 2009) (stating "the gov's office is flat out against this happening")).  On September 15, 2009, Chairman Snow informed Norris, "[W]e know with certainty where

you folks stand and will honor your position." (Filing No. 163-27, Email from Chairman Snow dated Sept. 15, 2009).

On September 22, 2009, Indiana Wholesale submitted an application to transfer its permitted location to the warehouse at 9347 Pendleton Pike as required by Indiana law. (Filing No. 163-33, Indiana Wholesale's Application for Transfer Permit). Excise Officer Alexander Ray conducted an inspection of the area Indiana Wholesale would occupy in the Pendleton Pike warehouse. (Filing No. 163-34, Memo from Master Officer Alexander Ray dated Oct. 9, 2009). In a memorandum to ATC Executive Secretary Edward Dunsmore, Officer Ray described the area Indiana Wholesale would use as their warehouse space, the manner in which the beverages would be placed onto a conveyor and combined with Monarch's beverages for delivery, the manner in which Monarch and Indiana Wholesale would be invoiced, and the location of Indiana Wholesale's office space. (*Id.*).

At the ATC's December 1, 2009 meeting, Chairman Snow informed Indiana Wholesale's counsel, Peter Rusthoven, that he "was intending to order an investigation at least after today's proceedings." (Filing No. 35, Meeting Transcript at 1). A more thorough investigation by Indiana State Excise Officer Richard Swallow, however, did not occur until March 2010—nearly six months after Indiana Wholesale's application was filed. (Filing No. 163-9, Deposition of Richard Swallow ("Swallow Dep.") at 53-54; Filing No. 163-37, Excise Police Report from Officer Swallow dated March 4, 2010). Officer Swallow was of the opinion that, because Monarch and EFT "operate as one

8

entity," the Services Agreement with Indiana Wholesale would violate the Prohibited

Interest Statutes.  (*See generally* Excise Police Report).  Specifically, he opined:

> [I]t is clear that Monarch Beverage and EF Transit operate as one entity even though they have different corporation names.  All of the documents state Indiana Wholesale Wine & Liquors is entering into an agreement with EF Transit, but in truth they are entering into an agreement with Monarch Beverage.  If this transfer is allowed to occur, Monarch Beverage would have an interest in Indiana Wholesale Wine & Liquor, which is prohibited by IC 7.1-5-9-3(b) (Beer Permittee's Interest Limited) [] and IC 7.1-1-2-5 (Direct and Indirect Prohibition) [].

(*Id.* at 8).

The ATC released the results of the investigation on April 19, the day before the

scheduled April 20 hearing on the application.  (Filing No. 163-40, Email from Edward

Dunsmore dated April 19, 2009).  On April 20, the parties agreed to schedule another

hearing on Indiana Wholesale's permit application to give them time to address the

concerns raised in Officer Swallow's report.  (Filing No. 163-41, April 20 Hearing

Transcript at 9).  Rusthoven noted that Indiana Wholesale had renewed its lease and its

permits at its current location, "[s]o from our standpoint with respect to what is after all

our transfer application, we are not in a hurry at this point for an immediate decision."

(*Id.* at 6).

On April 20, 2010 and June 1, 2010, Terry met with Officer Swallow,

Superintendent Alex Huskey of the Indiana State Excise Police, and Major Robin

Poindexter of the Indiana State Excise Police.  (Excise Police Report at 9).  Terry

submitted additional documentation relating to the relationship between EFT and

Monarch and further explained the proposed business relationship between EFT and

Indiana Wholesale.  (*Id.*).  In a supplemental report issued by Officer Swallow, he found

that it "does still appear that a prohibited interest or [the] potential for violations still

exists."  (*Id.*).  For example, under the current floor plan, he noted that Monarch, and not

EFT, was receiving Indiana Wholesale's product and that the products were stored in

Monarch's area.  (*Id.* at 10).  And he continued to have concerns that "Monarch Beverage

and EFT act[] as one."  (*Id.*).

On September 9, 2010, before the ATC officially voted, Indiana Wholesale

withdrew its application.  (Filing No. 163-43, Letter from Peter Rusthoven to Chairman

Snow dated Sept. 9, 2010).  In a formal letter to the ATC, Rusthoven explained,

"[B]ecause consideration of th[e] matter remained pending as Indiana Wholesale's lease

of its current Indianapolis premises was expiring, Indiana Wholesale renewed that lease

through March 2011, and also renewed its permits at that location."  (*Id.*).

### D.     2012 Tentative Agreement with EFT

In 2012, EFT and Indiana Wholesale proposed a narrower agreement under which

EFT would transport and deliver products for, but not lease warehouse space to, Indiana

Wholesale in exchange for a flat, per-case fee.  (Filing No. 163-46, Letter from Terry

dated April 20, 2012).  Under the 2012 Carrier's Agreement, EFT would send a truck

over to the Indiana Wholesale warehouse, load the orders onto the truck, and take them to

the Pendleton Pike warehouse.  (Terry Dep. at 118).  The products would be "cross-

docked" and placed on the warehouse floor.  (*Id.*).  Indiana Wholesale's products would

then be loaded into EFT's delivery trucks along with other wholesalers' products,

including Monarch's.  (*Id*. at 113-14, 118).

10

The Carrier's Agreement provided it would not be effective until the earlier of (i) the date the ATC issues its written approval of the Agreement or (b) the sixty-first day after its delivery to the ATC, if no written objection from the ATC had been issued during the sixty (60) days following such delivery.  (Filing No. 163-46, Carrier's Agreement ¶ 1 at EFT532).  Therefore, on April 20, 2012, EFT submitted a copy of the Carrier's Agreement between EFT and Indiana Wholesale to the current Chairman of the ATC, Alex Huskey, seeking the ATC's approval.[1]  (Filing No. 163-46, Letter from Terry dated April 20, 2012 at EFT536).  Officer Brian Stewart conducted an investigation regarding the 2012 agreement and reported his findings.  (Filing No. 167-5, Report dated May 29, 2012).  The report signaled concerns that the business arrangement had the potential to violate the Prohibited Interest Statutes.  (*Id.* at ATC 905-07).  Of particular concern was where Indiana Wholesale's liquor products would be located on the warehouse floor—*i.e.*, in the area sublet to Monarch, or in an area not sublet to Monarch. (*Id.* at ATC 905-06).

Like the 2009 Services Agreement, the Governor's Office was opposed to the 2012 Carrier's Agreement.  (Bedwell Dep. at 85-86).  According to Officer Bedwell, the ATC's 30(b)(6) witness, the Commission advised the Governor's Office that it would not approve the agreement.  (*Id.* ("Q: Was the Governor's Office advised that the Commission would not bless the proposal?  A: Yes.").

In a letter dated June 19, 2012, Chairman Huskey informed Terry:

---

[1] Although the ATC's approval was required by the parties' Carrier Agreement, it was not required under Indiana law.  (Terry Dep. at 114).

> Although the Commission has some concerns about potential prohibited interests, it will not render legal advice to an alcoholic beverage permit holder. The legalities of such a relationship should be thoroughly vetted with your attorney.

(Filing No. 163-47, Letter from Chairman Huskey dated June 19, 2012). Indiana Wholesale interpreted the letter as tantamount to a denial and informed EFT that it could not go forward with the Agreement.

> [The ATC's letter] creates, at a minimum, substantial controversy over whether the provision and use of delivery services under the Agreement is legally permissible, and substantial risk that proceeding under the Agreement will lead to Commission action citing one or both of the parties for violating Indiana law [sic] alcoholic beverage laws, and seeking to impose sanctions for such violation. In these circumstances, Indiana Wholesale believes it cannot proceed under the Agreement (or under any other contract under which EF Transit would provide delivery services for Indiana Wholesale) unless and until that controversy is resolved and that risk is eliminated.

(Filing No. 163-51, Letter from Indiana Wholesale's President, James Howard, dated Nov. 12, 2012).

At Officer Bedwell's 30(b)(6) deposition on behalf of the Commission, he testified that the Commission believes that both the 2009 and 2012 proposed agreements between EFT and Indiana Wholesale violate the Prohibited Interest Statutes. (Bedwell Dep. at 237-38). Chairman Cook and Officer Stewart testified similarly. (Cook Dep. at 138 ("I believe it's a prohibited interest by their [Monarch and EFT] relationship between the parties."); Stewart Dep. at 113 ("Q: But the State's position is because EFT and Monarch have the same owners, it's a prohibited interest? A: The – yeah, they would be prohibited from entering into the liquor side.")). *See also* ATC's brief in *Spirited Sales*, Cause No. 49D01-1502-PL-005220, at 15 n. 25 (stating that certain evidence was not considered

12

"material to the Commission's determination that there would be prohibited interests in the proposed arrangements.")).

This case followed.

## III.    Motions for Summary Judgment

EFT moves for summary judgment on grounds that the FAAAA preempts Indiana's Prohibited Interest Statutes.  Defendants cross move for summary judgment on three grounds: (1) the ATC has Eleventh Amendment immunity; (2) EFT's claims are not ripe for adjudication; and (3) Indiana's Prohibited Statutes are not preempted by the FAAAA.

### A.    Eleventh Amendment Immunity

The Eleventh Amendment states that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States."  U.S. Const. amend. XI.  The Amendment "bars federal jurisdiction over suits brought against a state, not only by citizens of another state or a foreign state, but also by its own citizens."  *MCI Telecomm. Corp. v. Ill. Bell Tel. Co.*, 222 F.3d 323, 336 (7th Cir. 2000).  "The immunity conferred on a state by the Eleventh Amendment extends to state agencies as well."  *Id.*  Here, the ATC is a state agency.  Ind. Code § 7.1-2-1-1.

"The immunity afforded to states by the Eleventh Amendment, however, is not absolute."  *MCI Telecomm.*, 222 F.3d at 337.  The rule that a state cannot be sued in federal court has two exceptions: a state may waive its sovereign immunity and consent to suit in federal court, "or Congress may use its enforcement powers under the

fourteenth amendment to abrogate the states' eleventh amendment immunity." *MSA Realty Corp. v. Illinois*, 990 F.2d 288, 291 (7th Cir. 1993).  "For either exception to apply, the intent to waive or abrogate immunity must be explicit and unequivocal."  *Id.* (citing *Kroll v. Bd. of Trustees of Univ. of Illinois*, 934 F.2d 904, 907 (7th Cir. 1991), *cert. denied*, 502 U.S. 941 (1991)).  Here, Congress has not abrogated immunity in suits like this.

EFT argues the ATC waived a sovereign immunity defense because it litigated this case for two years before it sought dismissal.  The court does not agree.  The ATC did not voluntarily enter this case, nor did it remove the case to federal court.  Rather, EFT sued the ATC.  Once named as a party, the ATC had a duty to participate in these proceedings and it did, as shown by its compliance with discovery and timely filing of an Answer that asserted sovereign immunity as an affirmative defense.  Further, in the ATC's motion for summary judgment, the first issue raised in the Argument Section is its entitlement to Eleventh Amendment immunity.  For these reasons, the court finds the ATC did not waive its sovereign immunity defense.  Therefore, the summary judgment for the ATC is required.  As Defendants acknowledge, however, the claims against the members of the ATC in their official capacities can proceed.

### B.     Justiciability

Defendants argue that EFT's challenge to the Prohibited Interest Statutes is not sufficiently ripe to constitute a justiciable case or controversy.  EFT argues its challenge is ripe because, as a practical matter, the ATC has prohibited EFT from providing warehousing and transportation services to liquor wholesalers.  In the court's opinion,

14

this case presents two justiciability issues—standing and ripeness.  Because standing

bears on the court's jurisdiction, the court may consider this issue *sua sponte*.  *Family &*

*Children's Ctr., Inc. v. Sch. City of Mishawaka*, 13 F.3d 1052, 1058-59 (7th Cir. 1994).

### 1.      Standing

Article III, § 2, of the Constitution limits the "judicial power" of the United States

to the resolution of "cases" and "controversies."  *Valley Forge Christian Coll. v.*

*Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 471 (1982).  One

aspect of the case-or-controversy requirement is standing.  *Arizonans for Official English*

*v. Arizona*, 520 U.S. 43, 64 (1997); *O'Sullivan v. City of Chicago*, 396 F.3d 843, 853 (7th

Cir. 2005).  Standing turns on whether the plaintiffs have a personal stake in the

controversy and "whether the dispute touches upon the 'legal relations of the parties

having adverse legal interests.'" *O'Sullivan*, 396 F.3d at 853 (quoting *Flast v. Cohen*, 392

U.S. 83, 101 (1968)).  To have standing, a plaintiff must demonstrate: (1) an "injury in

fact" – an invasion of a legally protected interest which is (a) concrete and particularized

and (b) actual or imminent, not conjectural or hypothetical; (2) a causal connection

between the injury and the conduct complained of; that is, the injury has to be fairly

traceable to the challenged action of the defendant; and (3) it must be likely, as opposed

to merely speculative, that the injury will be redressed by a favorable decision.  *Lujan v.*

*Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

In addition to these constitutional requirements, there are prudential limitations on

the court's exercise of federal jurisdiction.  *Rawoof v. Texor Petroleum Co., Inc.*, 521

F.3d 750, 757 (7th Cir. 2008).  For example, "even when a plaintiff has alleged injury

sufficient to meet the 'case or controversy' requirement, . . . the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975); *see also Main Street Org. of Realtors v. Calumet City, Ill.*, 505 F.3d 742, 746 (7th Cir. 2007) (noting that "one cannot sue in a federal court to enforce someone else's rights").

Pre-enforcement challenges are permissible under Article III because "a probability of future injury counts as 'injury' for purposes of standing." *Am. Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 591 (7th Cir. 2012) (quoting *Bauer v. Shepard*, 620 F.3d 704, 708 (7th Cir. 2010)). To demonstrate the injury-in-fact requirement in a pre-enforcement challenge, [2] the plaintiff must show "an intention to engage in a course of conduct, arguably affected with a constitutional interest, but proscribed by statute, and [that] there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2342 (2014) (citing *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)).

EFT's Complaint alleges that the ATC's interpretation of the Prohibited Interest Statutes, as applied to motor carriers, is preempted by federal law and is thus barred by

---

[2] "The injury-in-fact standard is often satisfied in pre-enforcement challenges to limitations on speech." *Ctr. For Individual Freedom v. Madigan*, 697 F.3d 464, 473-74 (7th Cir. 2012); *see also Bell v. Keating*, 697 F.3d 445 (7th Cir. 2012) (First Amendment); *Ctr. For Individual Freedom v. Madigan*, 697 F.3d 464 (7th Cir. 2012) (First Amendment); *Am. Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583 (7th Cir. 2012) (First Amendment); *Wis. Right to Life State Political Action Comm. v. Barland,* 664 F.3d 139 (7th Cir. 2011) (First Amendment); *Schirmer v. Nagode*, 621 F.3d 581 (7th Cir. 2010) (First Amendment); *Brandt v. Vill. of Winnetka, Ill.*, 612 F.3d 647 (7th Cir. 2010) (First Amendment); *Wis.'s Envtl. Decade, Inc. v. State Bar of Wis.*, 747 F.2d 407 (7th Cir. 1984) (First Amendment).

the Supremacy Clause.  U.S. Const. Art. VI, cl. 2.  Thus, EFT's claim is "arguably affected with a constitutional interest."

Next, Defendants argue the only credible threat of future enforcement, if any, is directed at the wholesalers in this case, Monarch and Indiana Wholesale, and not EFT. This argument is belied by the Defendants' 30(b)(6) witness, Officer Stewart, who testified that the ATC considers EFT and Monarch as one entity for purposes of the alcohol beverage laws found in Title 7.1 of the Indiana Code.  (*See* Stewart Dep. at 114 ("Well, for purposes of [Title] 7.1, the Commission's position is they're not separate companies.")).  Thus, were Monarch to face sanctions from the ATC, EFT would also. (*See id.* at 115 ("I mean, when you look through the lens of the alcoholic beverage code, that, you know, the Commission's policy is, for the purposes of their permit, they're the same.")).

Whether EFT faces a credible threat of prosecution is the central issue.  This issue dovetails with whether this action is ripe, and is discussed in the next subsection of this Entry.

### 2.    Ripeness

The ripeness doctrine is "drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction."  *Reno v. Catholic Social Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993).  "Its basic rationale is to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a

17

concrete way by the challenging parties." *Abbott Labs. v. Gardner,* 387 U.S. 136, 148-49

(1967), *abrogated on other grounds in Califano v. Sanders*, 430 U.S. 99 (1977).  In

determining whether a case is ripe, the central inquiry is "whether there is a substantial

controversy, between parties having adverse legal interests, of sufficient immediacy and

reality to warrant the issuance of a declaratory judgment." *Wis.'s Envtl. Decade, Inc. v.

State Bar of Wis.*, 747 F.2d 407, 411 (7th Cir. 1984).  To clarify, a case is not ripe "when

the parties point only to hypothetical, speculative, or illusory disputes as opposed to

actual, concrete conflicts." *Wis. Cent., Ltd. v. Shannon*, 539 F.3d 751, 759 (7th Cir.

2008); *Decade*, 747 F.2d at 412 (stating a case is ripe if the prospect of legal action is a

"virtual certainty" and unripe if it is just a "distinct possibility").  Ripeness is related to

standing in that "if a threatened injury is sufficiently 'imminent' to establish standing, the

constitutional requirements of the ripeness doctrine will necessarily be satisfied." *Nat'l

Treasury Emps. Union v. United States*, 101 F.3d 1423, 1428 (D.C. Cir. 1996).

To demonstrate ripeness in a pre-enforcement challenge, a plaintiff must show that

the issues are fit for judicial decision and that the plaintiff will suffer hardship if the court

withholds consideration.  *Wis. Right to Life State Political Action Comm. v. Barland,* 664

F.3d 148 (7th Cir. 2011).  Issues are fit for judicial decision if the challenge raises

"almost purely legal issues" that are "quintessentially fit . . . for present judicial

resolution." *Metro. Milwaukee Ass'n of Commerce v. Milwaukee Cty.*, 325 F.3d 879, 881

(7th Cir. 2003) (internal quotation marks and citation omitted).  A plaintiff may show

hardship by demonstrating that: (1) enforcement is certain, but delayed or, (2) even if

enforcement is not certain, the mere threat of future enforcement has a present concrete

18

effect on the plaintiff's day-to-day affairs and a later challenge will cause irreparable adverse consequences.  *Id.* at 882.

EFT argues that the ATC effectively denied[3] Indiana Wholesale's 2009 transfer permit by engaging in a "program of delay."  But Rusthoven stated at the April 20, 2010 Commission meeting that Indiana Wholesale was not in a hurry for a decision. Furthermore, at most, the ATC would have denied *Indiana Wholesale's* transfer permit. There is no evidence the denial would have put EFT at risk of criminal or civil sanctions.

The 2012 Carrier's Agreement between EFT and Indiana Wholesale did not require the ATC's approval; however, the viability of the parties' proposed Carrier's Agreement was contingent on the ATC's approval.  Officer Stewart investigated the matter and submitted a report to the Commission noting areas of concern, including:

Did the EFT agreements represent a prohibited interest (I.C. 7.1-5-9-3[4])?

Were the EFT agreements an attempt to accomplish, indirectly, what Monarch is prohibited from doing directly (I.C. 7.1-1-2-5)?

---

[3] EFT states as fact that the Commission informed Indiana Wholesale, after Officer Swallow issued his supplemental report, that it planned to deny Indiana Wholesale's transfer permit application.  (Filing No. 162, Plaintiff's Memorandum in Support, Fact No. 67 at 16).  The testimony cited in support of that fact is from Terry of EFT/Monarch:

Q:  And who within the ATC advised of this adverse decision?
A:  I believe Tom Snow advised Pete Rusthoven [Indiana Wholesale's counsel].
Q:  And who told you that there was – that that communication had occurred between Mr. Snow and Mr. Rusthoven?
A:  Mr. Rusthoven.

(Terry Dep. at 96).  Terry's testimony is inadmissible hearsay; as such, the court will not consider it as evidence.

[4] Ind. Code § 7.1-5-9-3(b) provides, "It is unlawful for the holder of a brewer's or beer wholesaler's permit to have an interest in a liquor permit of any type under this title."

(Report dated May 29, 2012, at ATC 907).  The Commission then issued a letter to EFT

noting it had "some concerns about prohibited interests," but would not give an advisory

opinion.  (Letter dated June 19, 2012).  The letter was enough for Indiana Wholesale to

back out of the Carrier's Agreement.

Notwithstanding the ATC's failure to opine on the validity of the business

arrangement between EFT and Indiana Wholesale, EFT argues that the ATC currently

believes that EFT's 2009 and 2012 proposed agreements with Indiana Wholesale violate

the Prohibited Interest Statutes.  (Bedwell Dep. at 237-38 ("Q: So, again, no mistake, the

State's position is that the 2009 and the 2012 transactions both violate state law because

of the prohibited interest provision?  A: Yes."); Cook Dep. at 138 ("I believe it's a

prohibited interest by their [Monarch and EFT] relationship between the parties.");

Stewart Dep. at 113 ("Q: But the State's position is because EFT and Monarch have the

same owners, it's a prohibited interest?  A: The – yeah, they would be prohibited from

entering into the liquor side.")).  Thus, EFT argues, if it were to enter into a transportation

agreement with another liquor wholesaler in the future, it would face possible sanctions,

including revocation of its license.  *See* Ind. Code § 7.1-2-3-9 (providing that the

Commission has the discretionary authority to suspend or revoke all permits authorized

by Title 7.1); § 7.1-1-2-5 (providing that a person prohibited from holding an interest

directly is also prohibited from holding the interest indirectly).  This fear of future

enforcement, it continues, has forced it to refrain from entering into transportation

agreements which would otherwise be lawful.  (*See* Stewart Dep. at 113 ("Q: And if this

20

transaction, if instead of EFT it was FedEx or UPS, there is no problem whatsoever with it; correct?  A: Correct.  There would not be a prohibited interest, yes.")).

Viewing the evidence in the light most favorable to EFT, the court finds it has proven that the Commission believes that any proposed relationship between EFT and a liquor wholesaler *would be* a prohibited interest and that the Commission *may* take legal action *if* EFT were to enter into that type of business relationship.  But as of this date, the Commission has done nothing more than issue an advisory opinion noting concerns about *potential* prohibited interests.  Critically, the Commission has not threatened legal action against EFT nor concluded that legal action *should* be taken.  On this record, any threat to EFT is, therefore, nothing more than a distinct possibility.  *Decade*, 747 F.2d at 412; *People of State of Ill. v. Gen. Elec. Co.*, 683 F.2d 206, 210 (7th Cir. 1982) ("So if it were uncertain . . . whether the state would actually enforce the statute, we might well conclude that there was no actual controversy between the state and the companies when they brought the suit.").   In the absence of a concrete injury of sufficient immediacy and reality to warrant the issuance of a declaratory judgment, the court must find this case is not ripe for review.

## IV.   Remaining Motions

Plaintiff's motion for oral argument, and Indiana Beverage Alliance's and Wine & Spirits' motions for leave to file amicus briefs remain for consideration.  These motions are based on the issue of preemption; specifically, in the words of EFT, "whether the Federal Aviation Administration Authorization Act precludes Defendants from invoking the prohibited-interest provisions of the Indiana Alcoholic Beverages Law to bar EFT

from providing transportation services to liquor wholesalers." (Filing No. 164, Plaintiff's Motion for Oral Argument at 1). EFT's preemption claim, however, is not ripe for review. Accordingly, Plaintiff's motion for oral argument, and Indiana Beverage Alliance's and Wine & Spirits' motions for leave to file amicus briefs are **DENIED as MOOT**.

## V. Conclusion

The court finds the Alcohol and Tobacco Commission is entitled to Eleventh Amendment immunity, but the individual members of the Commission are not. The court further finds the action for declaratory judgment brought by EFT against those members is not ripe for review, notwithstanding Plaintiff's unopposed motion to supplement the record with Exhibit 65. As such, the court lacks jurisdiction over this action. Therefore, the court:

(1) **DENIES** the Plaintiff's Motion for Summary Judgment as not ripe for consideration (Filing No. 161);

(2) **GRANTS** the Defendants' Cross-Motion for Summary Judgment (Filing No. 165); (3) **GRANTS** Plaintiff's Motion for Leave to Supplement Designations of Evidence (Filing No. 177);

(4) **DENIES as MOOT** Plaintiff's Motion for Oral Argument (Filing No. 164);

(5) **DENIES as MOOT** Indiana Beverage Alliance's Motion for Leave to Appear as *Amicus Curiae* and to File Brief in Support of the State (Filing No. 169); and

(6) **DENIES as MOOT** Wine & Spirits' Motion for Leave to File *Amicus Curiae*

Brief in Support of Defendants' Cross-Motion for Summary Judgment (Filing No.

170).


**SO ORDERED** this 13th day of September 2016.

RICHARD L. YOUNG,  CHIEF JUDGE
United States District Court
Southern District of Indiana


Distributed Electronically to Registered Counsel of Record.